DAVID A. LOWE (SBN: 178811)
Email: dal@rezlaw.com
ZOË DEGEER (SBN: 298698)
Email: zrd@rezlaw.com
RUDY, EXELROD, ZIEFF & LOWE, LLP
351 California Street, Suite 700
San Francisco, CA 94104
Telephone: (415) 434-9800
Facsimile: (415) 434-0513

Attorneys for Plaintiff
Nicholas Caldwell

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| NICHOLAS CALDWELL, | Case No. _____ |
| Plaintiff, | **COMPLAINT FOR BREACH OF CONTRACT, SEVERANCE BENEFITS, EQUITABLE RELIEF, AND STATUTORY PENALTIES (ERISA)** |
| vs. | |
| ELON MUSK; X CORP., f/k/a TWITTER, INC.; TWITTER, INC. CHANGE OF CONTROL AND INVOLUNTARY TERMINATION PROTECTION POLICY; LINDSAY CHAPMAN; BRIAN BJELDE; DHRUV BATURA; and DOES 1-20, inclusive, | |
| Defendants. | |
| _____/ | |

RUDY EXELROD ZIEFF & LOWE LLP
351 CALIFORNIA STREET, SUITE 700
SAN FRANCISCO, CALIFORNIA 94104
PH (415) 434-9800 | FX (415) 434-0513 | www.rezlaw.com

RUDY EXELROD ZIEFF & LOWE LLP
351 CALIFORNIA STREET, SUITE 700
SAN FRANCISCO, CALIFORNIA 94104
PH (415) 434-9800 | FX (415) 434-0513 | www.rezlaw.com

NICHOLAS CALDWELL, complains and alleges as follows:

## INTRODUCTION

1.      This case is yet another example of Elon Musk dodging his legal obligations and refusing to pay what he contractually owes.  Defendant Musk knew full well when he purchased Twitter, Inc. that certain key executives were entitled to industry-standard severance packages if they remained employed through the acquisition and then resigned for "Good Reason" or were fired without "Cause."  Relying on the promised severance benefits, Plaintiff Nicholas Caldwell, General Manager of Twitter's "Core Tech" organization, remained employed throughout the tumultuous acquisition period and carried out his responsibilities effectively, consistent with the directives of management and the Twitter Board of Directors, and in the best interests of the business. After the deal closed however, Musk cheated Mr. Caldwell and other executives out of a combined $200,000,000 in severance benefits by falsely accusing them of misconduct and purporting to fire them for "Cause."

2.      Mr. Caldwell *never* engaged in *any* misconduct or did *anything* which could be considered "Cause" for termination.  Tellingly, Musk's termination letter, like those of the other executives, did not include *any* facts demonstrating any misconduct or grounds for termination for "Cause."  With no factual basis, Musk simply accused Mr. Caldwell of misconduct as a ploy to evade paying him millions of dollars in severance benefits that Musk / Twitter owed to Mr. Caldwell.[1]

3.      Musk then appointed his agents (employees from his companies) to deny the severance claims filed by Mr. Caldwell and the other executives as part of the severance benefit plan administration process.  The entire termination and administrative claims process was a sham to deny in bad faith the claims of Mr. Caldwell and the other executives—who Musk terminated specifically to deny them the severance plan benefits.

4.      Mr. Caldwell brings this action for wrongful denial of severance benefits under Section 502(a)(1)(b) of the Employee Retirement Income Security Act of 1974, as amended

---

[1] Mr. Caldwell's severance benefits include twelve months of base salary and COBRA premiums, plus 50% of his unvested Restricted Stock Units.

1  ("ERISA").  In addition, because Musk fired him to interfere with his right to benefits,

2  Mr. Caldwell brings an "interference" claim in violation of ERISA Section 510.  Mr. Caldwell

3  also brings a claim for refusal to provide materials required by ERISA, in violation of ERISA

4  Section 502(c).  Finally, Mr. Caldwell brings claims for breach of his Twitter, Inc. 2013 Equity

5  Incentive Plan Restricted Stock Unit Agreements ("Award Agreements") and the implied

6  covenant of good faith and fair dealing, because Twitter breached its contractual obligation to

7  vest a portion of his equity according to the regular vesting schedule in November 2022, prior to

8  his termination.

9  **PARTIES**

10      5.      Plaintiff Nicholas Caldwell ("Plaintiff" or "Mr. Caldwell") was an employee of

11  Twitter, Inc. (now Defendant X Corp., referred to collectively herein as "Twitter" or "the

12  Company") from June 2020 until November 2022.  From December 31, 2021, through his

13  termination in November 2022, Mr. Caldwell was General Manager of the Core Tech (also

14  known as "RedBird") organization—the largest business unit within Twitter.  Throughout his

15  tenure with Twitter, Mr. Caldwell was a resident of and worked in San Francisco, California.

16  Mr. Caldwell currently resides in New York, New York.  Mr. Caldwell is a participant, as

17  defined by ERISA § 3(7), 29 U.S.C. § 1002(7), in the Twitter, Inc. Change of Control and

18  Involuntary Termination Protection Policy, as amended and restated effective August 8, 2014

19  (the "Plan").[2]

20      6.      Defendant Elon Musk is the Chairman, Sole Director, Chief Technology Officer,

21  and controlling shareholder of Defendant X Corp., the entity into which he merged Twitter, Inc.

22  as a result of the acquisition.  At all times relevant to the Complaint, Musk was the CEO of X

23  Corp.  Defendant Musk was and is the de facto Administrator of the Plans.

24      7.      Defendant X Corp. is a Nevada corporation with its headquarters in San Francisco,

25  California and successor in interest to Twitter, Inc., a Delaware corporation headquartered in San

26  Francisco, California. X Corp. succeeded to all of Twitter's obligations upon the October 27,

27

28  _____
    [2] A copy of the Plan is attached hereto as Exhibit 1.

3
COMPLAINT

CASE NO. _____

RUDY EXELROD ZIEFF & LOWE LLP
351 CALIFORNIA STREET, SUITE 700
SAN FRANCISCO, CALIFORNIA 94104
PH (415) 434-9800 | FX (415) 434-0513 | www.rezlaw.com

1    2022, closing of the merger transaction, including Twitter's obligations under the Plans.  X Corp.

2    is the Plan Sponsor, de facto Administrator, and funding source of the Plans.

3        8.    Upon Musk's acquisition of Twitter, there was and continues to be such unity of

4    interest and ownership between Twitter and Musk that there is no longer a separate corporate

5    status among Musk, Twitter, and Twitter's successor X Corp.  Musk controls Twitter's decision

6    making and operations and disregards corporate formalities in conducting Twitter's operations

7    based on his personal whims and/or polls conducted from his personal Twitter account.

8        9.    Musk often employs and relies on Excession, LLC ("Excession"), his personal

9    family office, and Excession employees to conduct X Corp. business.  Musk also relies on

10   personal friends, family members, and longtime business associates and investors to provide

11   services to Twitter.  On information and belief, Musk brought in family members to work at

12   Twitter.

13       10.   Musk has commingled assets of his other companies with Twitter.  On

14   information and belief, Musk has allowed Twitter's assets to be used by his other companies,

15   including Tesla and xAI.  Additionally, Musk regularly uses employes of his other companies to

16   conduct Twitter business and has granted them access to Twitter's systems and records.  For

17   instance, as the Delaware Court of Chancery found, Musk enlisted approximately fifty Tesla

18   engineers to provide services to Twitter following the acquisition, none of whom were hired,

19   retained, or paid by Twitter for services they provided to Twitter.  xAI employees also reportedly

20   have been working out of Twitter's headquarters.

21       11.   It would be inequitable and unjust to prevent Plaintiff Caldwell from recovering

22   benefits and other remedies from Defendant Musk, who is personally responsible for and will

23   individually benefit from the acts of Twitter.

24       12.   Defendant Plan is a welfare benefit plan as defined by ERISA § 3(1), 29 U.S.C.

25   § 1002(1), because it is a plan or program that was established or maintained by Twitter for the

26   purpose of providing its participants with severance benefits.  The Plan is sponsored by Twitter.

27       13.   Defendant Lindsay Chapman identified herself in a February 16, 2023, letter to

28   Mr. Caldwell as the Administrator of the Plan, asserting that she had been appointed as the

RUDY EXELROD ZIEFF & LOWE LLP
351 CALIFORNIA STREET, SUITE 700
SAN FRANCISCO, CALIFORNIA 94104
PH (415) 434-9800 | FX (415) 434-0513 | www.rezlaw.com

RUDY EXELROD ZIEFF & LOWE LLP
351 CALIFORNIA STREET, SUITE 700
SAN FRANCISCO, CALIFORNIA 94104
PH (415) 434-9800 | FX (415) 434-0513 | www.rezlaw.com

Administrator on January 31, 2023.  In the same February 16, 2023, letter, which was on "Twitter, Inc. Human Resources" letterhead and sent from a Twitter email address, Defendant Chapman simultaneously identified herself as "Administrator, Human Resources."  Defendant Chapman, whose LinkedIn profile identifies her as a Senior Director of Human Resources at one of Musk's other companies (SpaceX) also purports to be a member of the Twitter Severance Administration Committee ("Committee"), which assertedly decided the administrative appeals that Plaintiff Caldwell submitted.  Defendant Brian Bjelde also purports to be a member of the Committee and is Vice President of Human Resources at SpaceX:  ostensibly Defendant Chapman's boss.  Defendant Dhruv Batura also purports to be a member of the Committee.  On information and belief Defendant Batura is or was at relevant times a Senior Director of Finance at X Corp., having previously worked for Musk for ten years at Tesla, Inc. (yet another Musk company).

14.	The true names and capacities of Defendants named herein as Does 1 through 20, whether individual, corporate, associate or otherwise, and the true involvement of Defendants sued herein as Does 1 through 20, are unknown to Plaintiff who therefore sues said Defendants by such fictitious names.  Plaintiff will amend this Complaint to show the true names, capacities, and involvement of Does 1 through 20 when ascertained.  Plaintiff is informed and believes and thereon alleges that each of the Defendants designated as a "Doe" is responsible in some manner for the events and happenings referred to herein, and that Plaintiff's injuries and damages as hereinafter set forth were proximately caused by said Defendants.

15.	Plaintiff is informed and believes and thereon alleges that each of the Defendants sued herein is or was the agent, employee, partner and/or representative of one or more of the remaining Defendants, and each of them was at all times acting within the purpose and scope of such agency and employment.  Plaintiff is further informed and believes that each of the Defendants herein gave consent to, ratified, and authorized the acts alleged herein to each of the remaining Defendants.

///
///

RUDY EXELROD ZIEFF & LOWE LLP
351 CALIFORNIA STREET, SUITE 700
SAN FRANCISCO, CALIFORNIA 94104
PH (415) 434-9800 | FX (415) 434-0513 | www.rezlaw.com

## JURISDICTION, VENUE, and DIVISIONAL ASSIGNMENT

16.     This Court has subject matter jurisdiction over Plaintiff's claims pursuant to ERISA §§ 502(e) and (f), 29 U.S.C. §§ 1332(e) and (f), and 28 U.S.C. § 1331.  Additionally, this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) because the parties are citizens of different states.  The amount in controversy exceeds $75,000 exclusive of interest and costs.

17.     Venue lies in the Northern District of California pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Twitter Change of Control and Involuntary Termination Protection Policy is administered in part in this District, and because Defendant can be found in this District.  Venue is also proper pursuant to 28 U.S.C. § 1391(b), because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred within this District.  Finally, Paragraph 24 of Plaintiff's Award Agreements with Twitter, under which his breach of contract and breach of the implied covenant of good faith and fair dealing claims arise, contain the following contractual venue provision, selecting the Northern District of California as a venue for resolving litigation of disputes arising under the Award Agreements:

> This Award Agreement will be governed by the laws of Delaware without giving effect to the conflict of law principles thereof. For purposes of litigating any dispute that arises under this Award of Restricted Stock Units or this Award Agreement, the parties hereby submit to and consent to the jurisdiction of the State of California, and agree that such litigation will be conducted in the courts of the County of San Francisco, California, or the federal courts for the United States for the Northern District of California, and no other courts, where this Award of Restricted Stock Units is made and/or to be performed.  (Exhibit 2, ¶ 24.)

18.     Plaintiff was employed in, and significant events material to this case occurred within, the County of San Francisco.  The obligations and liability complained of herein arose in the County of San Francisco, and Plaintiff suffered injury in the County of San Francisco.  This action is subject to assignment to the San Francisco or Oakland division.

## FACTUAL BACKGROUND

19.     Mr. Caldwell has been a leader in the tech industry for over 20 years.  He has worked at notable companies managing product and engineering teams, including Microsoft,

RUDY EXELROD ZIEFF & LOWE LLP
351 CALIFORNIA STREET, SUITE 700
SAN FRANCISCO, CALIFORNIA 94104
PH (415) 434-9800 | FX (415) 434-0513 | www.rezlaw.com

Reddit, Looker, Google, Twitter, and Peloton.  Mr. Caldwell earned a Bachelor of Computer Science and Electrical Engineering from MIT and an MBA from UC Berkeley.

### A.   Mr. Caldwell Was a Successful Executive at Twitter.

20.     In June 2020, Mr. Caldwell began working for Twitter as the VP of Engineering for the Consumer ("BlueBird") organization.  At the time, Mr. Caldwell reported to Mike Montano, the head of Engineering, who was a member of "Staff."  "Staff" is the term Twitter used to describe its executive leadership team and comprised executives reporting directly to the CEO.  Mr. Montano reported to then-CEO Jack Dorsey.

21.     During his tenure as VP of Engineering, Mr. Caldwell's only formal performance review was excellent, and he received positive performance feedback.  Mr. Montano gave Mr. Caldwell a 4/5 rating.

22.     On December 31, 2021, in recognition of Mr. Caldwell's excellent work, Parag Agrawal, who became Twitter's CEO in November 2021, promoted Mr. Caldwell to General Manager for CoreTech/RedBird, a newly-formed large organization focused on infrastructure, platform, and developer experience.

23.     As General Manager, Mr. Caldwell continued to receive excellent performance feedback.  In April 2022, he received an Impact Award, which was reserved for top-performing employees.  Mr. Caldwell never received any material negative feedback, let alone that he had failed to follow company policies or rules or engaged in gross negligence or willful misconduct.

### B.   Twitter Approved Mr. Caldwell's Participation in the Plan.

24.     As part of his December 31, 2021, promotion to General Manager, Mr. Caldwell began reporting directly to CEO Agrawal and became a member of "Staff."  In addition, as was customary for Staff and individuals at his level (General Manager), he became entitled to participate in the Plan.  On March 3, 2022, the Compensation Committee of the Twitter, Inc. Board of Directors met and discussed, among other items, the terms of the Plan and the addition to the Plan of newest members of Staff.  After consideration, the Compensation Committee approved adding Mr. Caldwell and other newly appointed members of Staff to the Plan. Thereafter, Twitter provided the formal Participation Agreement to Mr. Caldwell, which he

entered into on May 11, 2022.  On information and belief, the approval of Mr. Caldwell's participation in the Plan was consistent with prior practice (i.e., that members of Staff, including executives at the General Manager level were approved for participation) and in the ordinary course of business.

25.     Pursuant to the Plan, the Participation Agreement entitles Mr. Caldwell to "Equity Vesting, Cash Severance and COBRA Benefit" if he is an Eligible Employee who is subject to an Involuntary Termination during the Change of Control Period ("COC Qualified Termination"). An Involuntary Termination is defined as "a termination of employment by the Company other than for Cause, death or Disability or a termination of employment by [Mr. Caldwell] for Good Reason."

26.     Under the Plan and his Participation Agreement, Mr. Caldwell is entitled to accelerated vesting of 50% of his then-unvested equity, one year of base salary, and one year of COBRA benefits if he experiences a COC Qualified Termination, whether a resignation for Good Reason or a termination by the Company other than for Cause.

**C.     Elon Musk Created Massive Uncertainty During his Chaotic Takeover of Twitter.**

27.     Starting in January 2022, Defendant Musk began accumulating significant amounts of Twitter, Inc. common stock.  By April, he owned over a nine percent ownership stake.

28.     After initially accepting and then backing out of Twitter's offer to join Twitter's Board of Directors, on April 13, 2022, Musk made an unsolicited offer to purchase the company at a price of $54.20 per share, which was a substantial premium over where the stock was then trading. After reviewing the offer and considering alternatives, Twitter's Board ultimately accepted Musk's offer to purchase the company, and the Merger Agreement was signed on April 25, 2022.

29.     Musk then attempted to back out of the deal.  By May 13, 2022, Musk had tweeted that the deal was "temporarily on hold."  Musk continued to maintain that he was not

RUDY EXELROD ZIEFF & LOWE LLP
351 CALIFORNIA STREET, SUITE 700
SAN FRANCISCO, CALIFORNIA 94104
PH (415) 434-9800 | FX (415) 434-0513 | www.rezlaw.com

RUDY EXELROD ZIEFF & LOWE LLP
351 CALIFORNIA STREET, SUITE 700
SAN FRANCISCO, CALIFORNIA 94104
PH (415) 434-9800 | FX (415) 434-0513 | www.rezlaw.com

bound to go through with the acquisition, culminating in his delivery to Twitter of a July 8, 2022, notice purporting to terminate the Merger Agreement.

30.     Twitter sued Musk to enforce the Merger Agreement.  After intense litigation and on the eve of trial (and Musk's deposition), Musk caved and agreed to complete the acquisition. On October 27, 2022, the acquisition closed.  However, between mid-May and late October, there was enormous uncertainty as to whether the deal would close, as reflected in Twitter's volatile stock price during those months.  Many employees left the company during this tumultuous period. Mr. Caldwell and other executives worked diligently to retain key employees and to operate the business responsibly and consistent with the Merger Agreement and their obligations to the Twitter, Inc. Board and shareholders.

31.     As has been publicly reported, Musk then rushed the closing of the deal and immediately fired multiple top executives, including former CEO Parag Agrawal, in a misguided and legally improper ambush to interfere with their right to severance benefits under the Plan.  As he took over the day-to-day operations, Musk issued various draconian ultimatums to employees including that they should resign unless they were willing to "work[] long hours at high intensity" and "be extremely hardcore."  He tweeted that employees who were working remotely would be required to return to in person work.  Hundreds more employees resigned, further threatening the stability of the company.

## D.     Musk Terminated Mr. Caldwell After His Resignation for Good Reason Became Effective.

32.     The Plan expressly provides that if after a change of control Mr. Caldwell no longer reports to the CEO of a publicly traded company, this constitutes a material adverse change in the scope of Mr. Caldwell's authority, powers, functions, duties, responsibilities, or reporting relationship, which is grounds for resignation for Good Reason.  One day after the acquisition closed, October 28, 2022, Twitter's stock stopped trading on the New York Stock Exchange.[3]  When Musk fired CEO Agrawal on October 27, 2022, and Twitter stopped trading

---

[3] "Here's what happens to Twitter's stock now that it's a private company," https://www.nbcnews.com/business/business-news/what-happens-to-twitter-stock-now-going-private-rcna54531.

on October 28, Mr. Caldwell "ceas[ed] to directly report to the chief executive officer or board of directors of a publicly traded entity."

33.     On the same day that Twitter's stock stopped trading, October 28, 2022, Mr. Caldwell informed the company he was resigning for Good Reason pursuant to the Plan.  He stated in his notice for Good Reason that he was willing to stay employed by the company as long as the company needed for him to transition his role.  Mr. Caldwell also requested the company's "standard separation agreement" referenced in the Plan, so that he could execute the agreement and receive the severance benefits owed to him.

34.     On November 2, 2022, Twitter emailed Mr. Caldwell in response to his notice of resignation for Good Reason, informing him that his access to company systems was being cut off immediately, effectively accepting his resignation.  The email also notified Mr. Caldwell that he would be employed until November 27, 2022, a date that Twitter unilaterally chose.  Twitter did not request that Mr. Caldwell remain employed for a 30-day cure period.  Rather, Twitter informed Mr. Caldwell that he would be employed "until" November 27, 2022, *i.e.*, the beginning of the November 27, implying that his last day of active employment would be November 26, 2022.  Twitter did not dispute Mr. Caldwell's assertion of grounds for Good Reason.  However, Twitter failed to provide the standard separation agreement to Mr. Caldwell.

35.     On November 22, 2022, Mr. Caldwell's counsel sent a letter to Twitter again enclosing Mr. Caldwell's notice for Good Reason resignation and requesting the standard separation agreement.  Twitter received the letter on November 23, 2023, but failed to respond.

36.     On November 27, 2022, after Mr. Caldwell's resignation for Good Reason became effective (on the date chosen by Twitter), Musk sent Mr. Caldwell a letter purportedly terminating him for Cause.  Musk claimed to base this decision on two prongs of Cause, as defined by the Plan: "(c) (an uncurable 'failure to comply with the Company's written policies or rules, including its code of conduct'), and (e) ('your gross negligence or willful misconduct in the performance of your duties')."  Musk did not state or otherwise identify or refer to any facts, events, or circumstances to support these assertions.

///

RUDY EXELROD ZIEFF & LOWE LLP
351 CALIFORNIA STREET, SUITE 700
SAN FRANCISCO, CALIFORNIA 94104
PH (415) 434-9800 | FX (415) 434-0513 | www.rezlaw.com

RUDY EXELROD ZIEFF & LOWE LLP
351 CALIFORNIA STREET, SUITE 700
SAN FRANCISCO, CALIFORNIA 94104
PH (415) 434-9800 | FX (415) 434-0513 | www.rezlaw.com

**E.**     **Musk's Employees Denied Mr. Caldwell's Claim for Benefits Based on False and Shifting Reasons.**

**1.**     <u>**Musk Employee Lindsay Chapman Denied Mr. Caldwell's Claim Based on False and Shifting Reasons.**</u>

37.     Twitter fired Mr. Caldwell via a letter signed personally by Musk on November 27, 2022.  In the letter, Musk specifically referenced the Plan definition of Cause and asserted two grounds for termination:  "Specifically, you have engaged in conduct that constitutes Cause within the meaning of the policy, including, but not limited to prongs (c) (an incurable 'failure to comply with the Company's written policies or rules, including the Code of Conduct') and (e), ('your gross negligence or willful misconduct in the performance of your duties')."  The letter provided no elaboration or facts beyond these conclusory allegations.

38.     On December 20, 2022, Mr. Caldwell made a claim for benefits under the Plan. Because Musk's termination letter had stated no facts on which he based his conclusory allegations of a policy violation, misconduct or gross negligence, there were no facts for Mr. Caldwell to rebut.  However, Mr. Caldwell's claim articulated the grounds for his entitlement to benefits under the Plan.

39.     On February 16, 2023, Musk employee Lindsay Chapman notified Mr. Caldwell that she had been "appointed as Administrator of the Plan on January 31, 2023."  Notably, Ms. Chapman sent the letter on letterhead showing her to be a part of the Twitter Human Resources team:

**Lindsay Chapman**
Human Resources

**Twitter, Inc.**
1355 Market Street, #900
San Francisco, CA 94103

She signed the letter as "Administrator, Human Resources," and sent the letter from her Twitter (lchapman@twitter.com) email address.  The letter did not specify who had appointed Ms. Chapman Plan Administrator.  According to her LinkedIn profile, she currently works for another Musk company, SpaceX.

*///*

40.     On June 15, 2023, Ms. Chapman sent Mr. Caldwell a letter denying his claim for benefits, purportedly in her role as appointed Plan Administrator.  In the denial letter, Ms. Chapman stated that she denied Mr. Caldwell's claim because: 1) Mr. Caldwell's resignation for Good Reason was not effective because there were no grounds constituting "Good Reason" on the date of his notice of resignation and because his resignation date was prior to the expiration of a required 30-day cure period; and 2) Mr. Caldwell was terminated for Cause based on his gross negligence or willful misconduct in the performance of his duties.  Notably, she did not mention any policy or rule violation, as had been alleged by Musk.  Ms. Chapman also asserted that the Board had "clarified" that the Plan did not allow for any acceleration of time-based vesting of equity.

41.     Ms. Chapman's conclusion that the Good Reason resignation was not effective was based on the irrational, "through the looking glass" positions that: 1) Twitter was still a publicly traded company even after the acquisition closed and it announced that its stock had stopped publicly trading; 2) Mr. Caldwell was still employed even after the time Twitter had told him his resignation was effective; and 3) even if Mr. Caldwell had already resigned for Good Reason, Musk still had the power to fire Mr. Caldwell for Cause in order to deny him severance benefits.

42.     Ms. Chapman's conclusion that Mr. Caldwell was fired for Cause *abandoned* and did not address Musk's contention in the termination letter that Mr. Caldwell had been fired on the basis of "prong[] (c) (an incurable 'failure to comply with the Company's written policies or rules, including the Code of Conduct')."  Because Ms. Chapman could not identify any policy or rule that Mr. Caldwell had violated (despite Musk's assertions in the termination letter), she focused solely on alleged willful misconduct or gross negligence, specifically that Mr. Caldwell had engaged in corporate waste and had improperly approved retention bonuses for his organization in violation of the Merger Agreement.

43.     The allegations that Mr. Caldwell had engaged in corporate waste and had improperly approved retention bonuses for his organization in violation of the Merger Agreement were made for the very first time in the denial letter and based on manifest misstatements of the

COMPLAINT

CASE NO. _____

RUDY EXELROD ZIEFF & LOWE LLP
351 CALIFORNIA STREET, SUITE 700
SAN FRANCISCO, CALIFORNIA 94104
PH (415) 434-9800 | FX (415) 434-0513 | www.rezlaw.com

1   facts.  For example, Ms. Chapman asserted that Mr. Caldwell was responsible for corporate waste

2   associated with an event *that occurred before he was employed at Twitter*.  In another example,

3   Ms. Chapman's denial letter misleadingly asserted that Mr. Caldwell knowingly paid out bonuses

4   pursuant to a new bonus plan that Musk had rejected in June 2022, when in fact the retention

5   bonuses were paid out pursuant to an existing plan that had been in place before the acquisition,

6   had been approved by the Board and was allocated in the ordinary course of business to retain

7   key employees, consistent with the Merger Agreement and the directives of management and the

8   HR team.  These are just two of many examples of egregious factual inaccuracies that

9   Ms. Chapman marshalled to support her predetermined plan to deny Mr. Caldwell's claim.

10          44.    On several occasions—including on December 20, 2022, June 26, 2023, July 24,

11   2023, and September 11, 2023—Mr. Caldwell requested documents relevant to his claim for

12   benefits from the Plan Administrator.  However, the Plan Administrator withheld critical

13   information from Mr. Caldwell that would be favorable to his claim based on her assertion that

14   she did not rely upon such documents.  For example, the Plan Administrator withheld all

15   information relevant to cost cutting projects that would directly refute Twitter's allegations of

16   corporate waste, Mr. Caldwell's performance records, and all requested meeting decks and notes

17   during the relevant time periods.  To the extent that these records were relied upon or were

18   relevant to the bases for firing Mr. Caldwell, they should have been produced.  To the extent that

19   they were relevant to the bases for firing Mr. Caldwell but were *not* relied upon by the Plan

20   Administrator, that further demonstrates Ms. Chapman's clear bias in denying Mr. Caldwell's

21   claim.

22          **2.    Mr. Caldwell Timely Appealed the Improper Denial of His Claim.**

23          45.    On October 9, 2023, Mr. Caldwell submitted a request for review of the denial to

24   Twitter's Severance Administration Committee.  Mr. Caldwell's appeal was supported by

25   declarations, including from former CEO Agrawal and an executive compensation expert, and

26   documentary evidence.  Mr. Caldwell's appeal and supporting evidence soundly refuted each of

27   the purported bases for denying his claim.

28   *///*

RUDY EXELROD ZIEFF & LOWE LLP
351 CALIFORNIA STREET, SUITE 700
SAN FRANCISCO, CALIFORNIA 94104
PH (415) 434-9800 | FX (415) 434-0513 | www.rezlaw.com

46. The appeal document and supporting documents established that all of Mr. Caldwell's actions were taken in the ordinary course of business, at the direction of his management and the Board of Directors, in compliance with the Merger Agreement, and in the best interests of Twitter, Inc. and its shareholders. Specifically, the appeal demonstrated that Mr. Caldwell's authorization of retention bonuses was authorized by the Board, in the ordinary course of business, consistent with past practices (in line with the Merger Agreement), and for the crucial purpose of retaining key employees through a tumultuous transition period. In addition, the appeal thoroughly debunked the fabricated allegations that Mr. Caldwell had engaged in any sort of corporate waste or fraud and established that, in fact, he had engaged in appropriate cost-cutting consistent with the directives from management and the Board.

47. Finally, Mr. Caldwell submitted an expert declaration refuting Ms. Chapman's theory that the Board had altered the Plan to prohibit acceleration of time-based equity vesting. Among other things, the expert submitted Twitter's own proxy statement, which specifically informed shareholders that the Plan allowed for such accelerated vesting.

48. The appeal also explained why Mr. Caldwell's resignation for Good Reason was valid and effective prior to Musk's post-facto attempt to fire him for Cause. *First*, the appeal noted that grounds for Good Reason existed because Twitter stock had stopped trading on October 28, and Mr. Agrawal had been fired on October 27, so Mr. Caldwell was no longer reporting to the CEO of a publicly traded company as of October 28.[4] *Second*, the appeal included the documents showing that it was Twitter, not Mr. Caldwell, that selected his last date of employment, notifying him that his access was being cut off immediately, and that he would be employed only "until" November 27, 2022. If any cure period was required, Twitter clearly waived it by selecting the separation date of November 27. Thus, when Musk fired him on November 27, 2022, Mr. Caldwell had already resigned for Good Reason.

///

---

[4] "Here's what happens to Twitter's stock now that it's a private company," https://www.nbcnews.com/business/business-news/what-happens-to-twitter-stock-now-going-private-rcna54531.

RUDY EXELROD ZIEFF & LOWE LLP
351 CALIFORNIA STREET, SUITE 700
SAN FRANCISCO, CALIFORNIA 94104
PH (415) 434-9800 | FX (415) 434-0513 | www.rezlaw.com

RUDY EXELROD ZIEFF & LOWE LLP
351 CALIFORNIA STREET, SUITE 700
SAN FRANCISCO, CALIFORNIA 94104
PH (415) 434-9800 | FX (415) 434-0513 | www.rezlaw.com

3.   **Musk's Employees Purporting to Act as the Severance Administration Committee Denied Mr. Caldwell's Appeal for False and Shifting Reasons.**

49.     On February 6, 2024, Twitter's Severance Administration Committee (the "Committee") denied Mr. Caldwell's request for review.  On information and belief, the Committee is made up of Ms. Chapman and other employees from Musk's companies acting on behalf of, and in the interests of Musk, and not in the interests of the Plan or its participants.

50.     Just as Ms. Chapman was forced to abandon Musk's allegation in the termination letter that Mr. Caldwell was fired for Cause for violating a Twitter rule or policy, the Committee was forced to abandon Ms. Chapman's contention that Mr. Caldwell was fired for Cause for engaging in corporate waste.  In light of the facially false "facts" on which Ms. Chapman had based her conclusion, the Committee was forced to retreat, acknowledging that the evidence was insufficient to find that Mr. Caldwell had engaged in corporate waste.

51.     That left only one basis for Cause as determined by the Plan Administrator:  that Mr. Caldwell had engaged in gross negligence or willful misconduct by paying out bonuses after the Merger Agreement was signed on April 25, 2023.  As with Ms. Chapman's findings, the Committee's conclusion that Mr. Caldwell engaged in gross negligence or willful misconduct is based on patently false allegations, including misleadingly stating that he "approved $800,000 in retention bonuses during the week preceding Closing," when in fact the retention bonuses had been submitted for approval much earlier and in the normal course of business via a budget approved by the Board consistent with prior practice.  In addition, the Committee based its conclusion that Cause existed to fire Mr. Caldwell in part because "the *total amount* of retention bonuses *approved by the Company* during the six-month Merger Period dramatically outpaced the retention bonuses during all of 2021," (emphasis added), acknowledging that the Committee's finding of Cause to fire Mr. Caldwell is in fact based on actions taken by the *Board*, not Mr. Caldwell individually.  The Committee ignored Mr. Caldwell's evidence and the Company's own documents and instead twisted the facts to piece together a basis for Cause that simply does not exist.

///

52.     Having concluded that the Plan Administrator's determination that Mr. Caldwell engaged in corporate waste was unsupported and unable to identify a factual basis to credibly support that Mr. Caldwell's approval of retention bonuses was improper, the Committee came up with a brand new allegation that it contended constitutes Cause.  Specifically, the Committee asserted in its denial letter that Mr. Caldwell engaged in willful misconduct by signing the Plan Participation Agreement that was offered to him by Twitter in May 2022.  This absurd allegation—raised for the very first time in the Committee's denial *after* Claimant submitted his claim and appeal and had no more opportunity to respond—lays bare just how much of a sham kangaroo court this ERISA claims process was.

53.     Once again, the Committee misstates the facts in an effort to concoct fake Cause to fire Mr. Caldwell.  Mr. Caldwell was promoted to General Manager and became a member of Staff on December 31, 2021, well before Mr. Musk made an offer to buy Twitter.  In early March 2022, the Compensation Committee of the Board met in due course and discussed the Plan and approved adding to the Plan the newly appointed members of Staff, including Mr. Caldwell.  This decision was in the ordinary course of business and consistent with prior practice.  Mr. Caldwell was then presented with the Participation Agreement in early May, which he signed on May 11, 2022.  On information and belief, after the Merger Agreement was signed on April 25, 2022, the Compensation Committee met again in May 2022 and reaffirmed its March decision to add to the plan the newly appointed members of Staff.  At the time that he signed the Participation Agreement in May 2022, Mr. Caldwell understood and believed in good faith that his participation in the plan was consistent with prior practice and had been approved in the ordinary course of business.  The Committee has not and cannot provide any evidence to the contrary.  This justification for terminating Mr. Caldwell for Cause—raised for the first time after Mr. Caldwell submitted his appeal of the denial of his claim—is frivolous and a further demonstration that the Committee has abdicated its fiduciary duty and will go to any length to further Musk's scheme to avoid paying severance contractually owed to Mr. Caldwell and the other executives.

///

RUDY EXELROD ZIEFF & LOWE LLP
351 CALIFORNIA STREET, SUITE 700
SAN FRANCISCO, CALIFORNIA 94104
PH (415) 434-9800 | FX (415) 434-0513 | www.rezlaw.com

F.   **The Plan Administrator and Committee Falsely Asserted that the Plan Does Not Allow for Acceleration of Equity.**

54.     The Plan and Participation Agreement expressly provide for the acceleration of equity in the event of a COC Qualified Termination.  Specifically, the Plan provides that as part of the severance benefits owed to Mr. Caldwell, he will be entitled to "a percentage set forth on your Participation Agreement of the then-unvested shares subject to each of your then-outstanding equity awards shall immediately vest and, in the case of options and stock appreciation rights, shall become exercisable . . . ."  Mr. Caldwell's Participation Agreement provides that his equity vesting acceleration benefit percentage is 50%.

55.     During the course of his employment with Twitter, Mr. Caldwell was granted equity awards in the form of both Restricted Stock Units ("RSUs") and Performance-Based Restricted Stock Units ("PSUs").  The RSUs vested solely through the passage of time, contingent upon continued employment through each vesting date *and subject to additional provisions that accelerate vesting in the event of certain types of terminations of employment*. The PSUs vested both upon the achievement of performance criteria and through the passage of time, contingent upon continued employment through each vesting date *and subject to vesting acceleration provisions in the event of certain types of terminations of employment*.

56.     Both the PSUs and RSUs agreements have language that explicitly contemplates the existence of other documents that may contain vesting acceleration provisions which would supersede the standard vesting schedule under certain circumstances, such as a COC Qualified Termination. Both agreements also explicitly provide that the awards will be subject to any vesting acceleration provisions contained in such documents.

1.   **The Merger Agreement.**

57.     On April 25, 2022, Twitter entered into a Merger Agreement pursuant to which it was to be acquired by X Holdings I, Inc. and X Holdings II, Inc.

58.     Section 3.6(b)(ii) of the Merger Agreement addressed the treatment of the PSUs in the merger and provided as follows:

> As of the Effective Time, each Company PSU that is outstanding immediately prior thereto and that is not a Vested Company PSU (each, an "Unvested Company PSU") shall be canceled and

RUDY EXELROD ZIEFF & LOWE LLP
351 CALIFORNIA STREET, SUITE 700
SAN FRANCISCO, CALIFORNIA 94104
PH (415) 434-9800 | FX (415) 434-0513 | www.rezlaw.com

converted into the right to receive an amount in cash, without interest, equal to the product of (i) the total number of shares of Company Common Stock subject to such Unvested Company PSU based on the achievement of the applicable performance metrics at the target level of performance and (ii) the Merger Consideration (the "Unvested PSU Consideration"). Subject to the holder's continued service with Parent and its Affiliates (including the Surviving Corporation and its Subsidiaries) through the applicable vesting dates, such Unvested PSU Consideration will vest and become payable at the same time as the Unvested Company PSU from which such Unvested PSU Consideration was converted **would have vested and been payable pursuant to its terms and shall otherwise remain subject to the same terms and conditions as were applicable to the underlying Unvested Company PSU immediately prior to the Effective Time** (except that performance-based vesting metrics and criteria shall not apply from and after the Effective Time).

(Emphasis added).

59.    Similarly, Section 3.6(d)(ii) of the Merger Agreement addressed the treatment of the RSUs in the merger and provided as follows:

As of the Effective Time, each Company RSU that is outstanding immediately prior thereto and that is not a Vested Company RSU (each, an "Unvested Company RSU") shall be canceled and converted into the right to receive an amount in cash, without interest, equal to the product of (i) the total number of shares of Company Common Stock subject to such Unvested Company RSU and (ii) the Merger Consideration (the "Unvested RSU Consideration"). Subject to the holder's continued service with Parent and its Affiliates (including the Surviving Corporation and its Subsidiaries) through the applicable vesting dates, such Unvested RSU Consideration will vest and become payable at the same time as the Unvested Company RSU from which such Unvested RSU Consideration was converted **would have vested and been payable pursuant to its terms and shall otherwise remain subject to the same terms and conditions as were applicable to the underlying Unvested Company RSU immediately prior to the Effective Time.**"

(Emphasis added).

60.    The effects of Sections 3.6(b)(ii) and 3.6(d)(ii) of the Merger Agreement were to: 1) convert the right to receive Twitter stock under the terms of the PSUs and RSUs into a right to receive an equivalent amount of cash (for both the PSUs and the RSUs) that would then become vested on the same terms and conditions as were previously applicable to the PSUs and RSUs; and 2) to deem the performance-based metrics no longer applicable for the PSUs (meaning the PSUs would vest solely on the passage of time and subject to acceleration in the same manner as

the RSUs).  Outside of those two changes, the language made it clear that all other terms and conditions of the awards—which include vesting acceleration provisions—were to remain unchanged.  The Twitter Board of Directors approved the treatment of both the PSUs and the RSUs consistent with Sections 3.6(b)(ii) and 3.6(d)(ii) of the Merger Agreement in its April 25, 2022, board minutes.  There was no notice to the Plan participants of any change negatively impacting their rights to acceleration or otherwise under the Plan.

**2.      The Proxy Statement.**

61.      On May 25, 2022, following the execution of the Merger Agreement, Twitter issued a proxy statement (the "Proxy Statement").  Importantly, page 66 of the Proxy Statement contains the following language regarding the purpose of the Plan:

> We believe that to properly motivate and incentivize our executive team in the event of a change of control and to the possibility of a termination without 'cause' or a termination with 'good reason,' a standardized 'double trigger' change of control and severance policy is critical.  Each NEO that remains employed with us participates in our Severance Policy, which provides standardized payments and benefits to the NEOs in the event of a termination without 'cause' by us or termination for 'good reason' by the participant, whether or not in connection with a change of control, to make these benefits consistent among the executives who have these arrangements.

This description makes it clear that Twitter considered it "critical" to have the Plan in place.  This language makes no mention of modifying or eliminating the equity vesting acceleration provisions of the Plan.

62.      Importantly, page 73 of the Proxy Statement contains a paragraph titled "Potential Payments Upon Termination or Change of Control."  This paragraph describes the benefits that are provided under the Plan to participants and states that one of the benefits provided under the Plan is "***acceleration of vesting of 50% (or 100% in the case of our CEO and CFO) of the shares underlying all of the NEO's then-unvested equity awards if the Involuntary Termination is in connection with a Change of Control.***"  This language closely tracks the exact benefits that are described in Mr. Caldwell's Participation Agreement with respect to equity award vesting acceleration (50% vesting acceleration of all unvested equity awards).

///

RUDY EXELROD ZIEFF & LOWE LLP
351 CALIFORNIA STREET, SUITE 700
SAN FRANCISCO, CALIFORNIA 94104
PH (415) 434-9800 | FX (415) 434-0513 | www.rezlaw.com

63.     The Proxy Statement is Twitter's official statement to investors and is required by the SEC and securities laws to be true and accurate.  Thus, it is notable that in the Proxy Statement issued after the Merger Agreement was signed, Twitter's interpretation of the Plan and the Participation Agreement was that the participants would receive accelerated equity vesting as part of their severance benefits.  At no time did the Company act to modify, amend, or correct the statement notifying the shareholders (including the Plan participants) that the Plan provided for accelerated vesting of time-based equity awards.

64.     The only reasonable interpretation of the Plan, the Equity Awards, the Merger Agreement, and the Proxy Statement, is that Mr. Caldwell is entitled to 50% of his Unvested Equity.  To the extent that the Plan Administrator determined that the Merger Agreement eliminated the right to accelerated vesting of equity, that decision is plainly wrong and an abuse of discretion.

**G.     Twitter Failed to Pay Mr. Caldwell Other Equity Awards He Was Owed on November 1, 2022, Pursuant to His Equity Plans.**

65.     Under the terms of his various equity agreements, including the Award Agreements, Mr. Caldwell's equity continued to vest while he was still employed.  There is no dispute that Mr. Caldwell was still a current employee on November 1, 2022.  However, Twitter failed to vest the 9,018 shares that were due to vest on that date.  Twitter's failure to vest these shares breached his Equity Agreements.

66.     On December 14, 2021, Mr. Caldwell and Twitter entered into a Restricted Stock Unit Agreement, which granted Mr. Caldwell approximately 88,636 Restricted Stock Units (RSUs) to vest quarterly beginning on February 1, 2022.  *See* Exhibit 2.  The RSUs vested and were granted to Mr. Caldwell accordingly on February 1, 2022, May 1, 2022, and August 1, 2022.  On November 1, 2022, another 5,540 RSUs were due to vest, but Twitter failed to vest this tranche, notwithstanding that Mr. Caldwell remained a current employee on November 1, 2022.  Pursuant to the Merger Agreement, Twitter was to pay out RSUs at $54.20/share.  Thus, Twitter failed to pay Mr. Caldwell $300,268.  (All valuations are based on Plaintiff's knowledge and belief and are subject to proof).

RUDY EXELROD ZIEFF & LOWE LLP
351 CALIFORNIA STREET, SUITE 700
SAN FRANCISCO, CALIFORNIA 94104
PH (415) 434-9800 | FX (415) 434-0513 | www.rezlaw.com

67.     As part of the Q1 2021 Compensation Planning Cycle, Mr. Caldwell was granted approximately 48,720 RSUs to vest quarterly, beginning on May 1, 2021.  The RSUs vested and were granted to Mr. Caldwell accordingly for the rest of 2021 and on February 1, 2022, May 1, 2022, and August 1, 2022.  On November 1, 2022, Twitter failed to vest the applicable tranche of 3,045 RSUs.  Pursuant to the Merger Agreement, Twitter was to pay out RSUs at $54.20/share.  Thus, Twitter failed to pay Mr. Caldwell $165,039. (All valuations are based on Plaintiff's knowledge and belief and are subject to proof.)

68.     As part of the Q1 2022 Compensation Planning Cycle, Mr. Caldwell was granted approximately 6,929 RSUs to vest quarterly beginning on May 1, 2022.  The RSUs vested and were granted to Mr. Caldwell accordingly on May 1, 2022, and August 1, 2022.  On November 1, 2022, Twitter failed to vest the applicable tranche of 433 RSUs.  Pursuant to the Merger Agreement, Twitter was to pay out RSUs at $54.20/share.  Thus, Twitter failed to pay Mr. Caldwell $23,468.60. (All valuations are based on Plaintiff's knowledge and belief and are subject to proof).

**LEGAL CLAIMS**

**FIRST CAUSE OF ACTION**
**(ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B))**
**(Claim for Benefits)**
**(Against All Defendants)**

69.     Plaintiff re-alleges and incorporates each and every paragraph above as though fully set forth herein.

70.     ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), permits a plan participant to bring a civil action to recover benefits due to him under the terms of a plan, to enforce his rights under the terms of a plan, and/or to clarify his right to future benefits under the terms of a plan.

71.     Plaintiff is entitled to benefits under the Defendant Plan.

72.     Defendants, and each of them, have violated, and continue to violate, the terms of the Plan and Plaintiff's rights thereunder.  Defendants, and each of them, have failed to pay Plaintiff benefits to which he is entitled under the terms of the Plan.

///

RUDY EXELROD ZIEFF & LOWE LLP
351 CALIFORNIA STREET, SUITE 700
SAN FRANCISCO, CALIFORNIA 94104
PH (415) 434-9800 | FX (415) 434-0513 | www.rezlaw.com

73.     Plaintiff is entitled to severance benefits under the terms of the Plan in the amount of approximately $19,290,000, plus interest, with the precise amount to be proven at trial.

### SECOND CAUSE OF ACTION
**(ERISA § 510, 29 U.S.C. § 1140)**
**(Interference with Attainment of Benefits through Unlawful Discharge)**
**(Against Defendants Elon Musk and X Corp.)**

74.     Plaintiff re-alleges and incorporates by reference each and every paragraph above as though fully set forth herein.

75.     ERISA § 510 provides that it is unlawful for any person to "discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary…for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan."

76.     Plaintiff is entitled to benefits under the Plan.

77.     Plaintiff provided notice of a Good Reason resignation on October 28, 2022. Twitter responded by cutting off Plaintiff's access and informing him that he would be employed until November 27, 2022.  On November 27, 2022, his resignation became effective, Twitter terminated Plaintiff, falsely claiming that the termination was for Cause.

78.     Twitter terminated Plaintiff's employment with the specific intent of preventing him from obtaining benefits to which he was entitled under the Plan.

79.     The termination of Plaintiff's employment to prevent him from obtaining benefits under the Plan constitutes unlawful interference with Plaintiff's rights under the Plan in violation of ERISA § 510, 29 U.S.C. § 1140.

80.     ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), permits a plan participant to bring a suit to obtain appropriate equitable relief to enforce the provisions of Title I of ERISA. Section 510 is part of Title I.

81.     Plaintiff seeks appropriate equitable relief in the form of restitution of the benefits owed to Plaintiff under the Plan, disgorgement of any profits derived by Defendants as a result of its ERISA violations, and all other forms of equitable relief to remedy Defendants' violation of Section 510, including surcharge.

RUDY EXELROD ZIEFF & LOWE LLP
351 CALIFORNIA STREET, SUITE 700
SAN FRANCISCO, CALIFORNIA 94104
PH (415) 434-9800 | FX (415) 434-0513 | www.rezlaw.com

**THIRD CAUSE OF ACTION**
**(ERISA § 502(c), 29 U.S.C. § 1132(c))**
**(Failure to Provide Required Materials)**
**(Against All Defendants)**

82.    Plaintiff re-alleges and incorporates by reference each and every paragraph above as though fully set forth herein.

83.    On several occasions—including on December 20, 2022, June 26, 2023, July 24, 2023, and September 11, 2023—Mr. Caldwell requested documents relevant to his claim for benefits from the Plan Administrator, pursuant to Section 104(b)(4) of ERISA, 29 U.S.C. § 1024(b)(4).

84.    ERISA Section 502(c), 29 U.S.C. § 1132 (c), requires a Plan Administrator within 30 days of a request to provide all documents required to be maintained and provided to participants.  Defendants did not timely comply, and have still not complied, by producing the documents and information required to be provided.  For example, Defendants did not respond to Plaintiff's December 20, 2022, Section 104(b) request until *April 11, 2023*.  Even then, Defendants failed to produce all of the required information.

85.    Moreover, Defendants also failed to timely provide Plaintiff the documents required to be produced pursuant to 29 C.F.R. § 2560.503-1(m)(8).

86.    Because Defendants violated ERISA Section 502(c), 29 U.S.C. § 1132 (c), Plaintiff is entitled to a penalty of $110 per day, running from the 30th day following his December 20, 2022, written request, until the complete materials are provided.

**FOURTH CAUSE OF ACTION**
**(Breach of Contract)**
**(Against Defendant X Corp.)**

87.    Plaintiff re-alleges and incorporates by reference each and every paragraph above as though fully set forth herein.

88.    Plaintiff provided valuable consideration under his Award Agreements by continuing employment with Twitter.  He fully performed his part of the bargain by remaining employed until his Good Reason resignation became effective on November 27, 2022, and by abiding by all other terms of the respective Award Agreements.

COMPLAINT

CASE NO. _____

RUDY EXELROD ZIEFF & LOWE LLP
351 CALIFORNIA STREET, SUITE 700
SAN FRANCISCO, CALIFORNIA 94104
PH (415) 434-9800 | FX (415) 434-0513 | www.rezlaw.com

89.     Twitter breached the common law of contracts when it failed to compensate Plaintiff as promised under the respective Award Agreements, by refusing to vest his November 1, 2022, equity tranches of approximately 9,018 RSUs without adequate justification under the terms of the agreements.  See, *e.g.,* Exhibit 2.

90.     As a result of Twitter's breach of respective equity agreements, Plaintiff is entitled to specific performance or damages of approximately: $488,775 (all valuations are based on Plaintiff's knowledge and belief and are subject to proof).  In addition, Plaintiff is entitled to interest at the legal rate.

**FIFTH CAUSE OF ACTION**
**(Breach of the Implied Covenant of Good Faith and Fair Dealing)**
**(Against Defendant X Corp.)**

91.     Plaintiff re-alleges and incorporates by reference each and every paragraph above as though fully set forth herein.

92.     The respective Award Agreements, like all contracts, contain an implied covenant of good faith and fair dealing, which prohibits either party from acting in a way that prevents the other party from receiving the benefits of the contract.  *See, e.g.,* Exhibit 2.

93.     Twitter improperly frustrated Plaintiff's ability to receive the grant awards to which he is entitled by refusing to vest his RSUs.  By depriving Plaintiff of the benefits of the agreements which he earned by performing his duties under the contract and to which he is entitled, Twitter breached the covenant of good faith and fair dealing.

94.     As a result of Twitter's breach of the implied covenant of good faith and fair dealing, Plaintiff is entitled to specific performance or damages of approximately: $488,775  (all valuations are based on Plaintiff's knowledge and belief and are subject to proof.  In addition, Plaintiff is entitled to interest at the legal rate.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Nicholas Caldwell prays for judgment and the following specific relief against Defendants as follows:

1.     Declare that Defendants have violated the terms of the Plan by failing to pay
           Plaintiff benefits in accordance with the term of the Plan;

2.   Order Defendants, and each of them, to pay benefits to Plaintiff under the terms of the Plan;

3.   For compensatory damages for wage loss, including any equity grants due to Plaintiff;

4.   Award equitable relief to Plaintiff, including restitution, disgorgement, front pay and/or equitable surcharge;

5.   For specific performance of the contracts alleged above;

6.   For statutory attorneys' fees and costs, pursuant to ERISA Section 502(g), 29 U.S.C. § 1132(g);

7.   For statutory penalties of $110 per day from January 20, 2023, to the date that Defendants provide Plaintiff with all documents and information required under ERISA Sections 104(b) and 502(c)(1), 29 U.S.C. §§ 1024(b), 1132(c)(1), and 29 C.F.R. § 2560.503-1(m)(8);

8.   For prejudgment interest and post-judgment interest as allowed by law; and

9.   For an award of such other and further relief as the Court deems just and proper.

DATED:  April 3, 2024                    Respectfully submitted,

RUDY, EXELROD, ZIEFF & LOWE, LLP

By: _____

DAVID A. LOWE
ZOË DEGEER
*Attorneys for Plaintiff*
*Nicholas Caldwell*

RUDY EXELROD ZIEFF & LOWE LLP
351 CALIFORNIA STREET, SUITE 700
SAN FRANCISCO, CALIFORNIA 94104
PH (415) 434-9800 | FX (415) 434-0513 | www.rezlaw.com

COMPLAINT                                          CASE NO. _____

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**DEMAND FOR JURY TRIAL**

Plaintiff hereby requests trial by jury for the Fourth and Fifth causes of action.

DATED:  April 3, 2024

Respectfully submitted,

RUDY, EXELROD, ZIEFF & LOWE, LLP

By: _____

DAVID A. LOWE
ZOË DEGEER
*Attorneys for Plaintiff*
*Nicholas Caldwell*

RUDY EXELROD ZIEFF & LOWE LLP
351 CALIFORNIA STREET, SUITE 700
SAN FRANCISCO, CALIFORNIA 94104
PH (415) 434-9800 | FX (415) 434-0513 | www.rezlaw.com

26
COMPLAINT
CASE NO. _____

# EXHIBIT 1

Twitter, Inc.

**Change of Control and Involuntary Termination Protection Policy**

**(as amended and restated effective August 8, 2014)**

This Change of Control and Involuntary Termination Protection Policy (the "**Policy**") is designed to provide certain protections to a select group of key Twitter, Inc. ("**Twitter**" or the "**Company**") employees if their employment is negatively affected by a change on control of Twitter. The Policy is designed to be an "employee welfare benefit plan," as defined in Section 3(1) of the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**") and this document is both the formal plan document and the required summary plan description for the Policy.

**Eligible Employee**: You are only eligible for Change of Control Severance Benefits and non-Change of Control Severance Benefits under the policy if you are an eligible employee under this Policy (an "**Eligible Employee**") and comply with its terms. To be an Eligible Employee, you (1) must have been designated as eligible by the Compensation Committee of the Board (the "**Compensation Committee**") and (2) must have executed a Participation Agreement (as defined below).

**Severance Benefits**: As an Eligible Employee for Change of Control Severance Benefits, you will be eligible for severance benefits under this Policy if: (1) during the Change of Control Period (as defined below) and (2) your employment with Twitter or any of its subsidiaries terminates as a result of an Involuntary Termination (a "**COC Qualified Termination**"). If your employment with Twitter or any of its subsidiaries terminates as a result of a COC Qualified Termination, you will be eligible to receive the applicable Equity Vesting, Cash Severance and COBRA Benefit described herein and specified on your Participation Agreement. As an Eligible Employee for non-Change of Control Severance Benefits, you will be eligible for severance benefits under this Policy if: (1) other than during a Change of Control Period and (2) your employment with Twitter or any of its subsidiaries terminates as a result of an Involuntary Termination (a "**Non-COC Qualified Termination**"). If your employment with Twitter or any of its subsidiaries terminates as a result of a Non-COC Qualified Termination, you will be eligible to receive the applicable Equity Vesting, Cash Severance and COBRA Benefit described herein and specified on your Participation Agreement. All benefits under this Policy shall be subject to your compliance with the Release Requirement and timing modifications required to avoid adverse taxation under Section 409A. A "**Qualified Termination**" is either a COC Qualified Termination or a Non-COC Qualified Termination, depending on whether the Involuntary Termination occurs within or outside of the Change of Control Period.

**Equity Vesting**: Upon a Qualified Termination, a percentage set forth on your Participation Agreement of the then-unvested shares subject to each of your then-outstanding equity awards shall immediately vest and, in the case of options and stock appreciation rights, shall become exercisable (for avoidance of doubt, no more than 100% of the shares subject to the outstanding portion of an equity award may vest and, with respect to an option or stock appreciation right, become exercisable pursuant to this provision). In the case of equity awards with performance-based vesting, all performance goals or other vesting criteria will be deemed achieved at target levels as to the percentage set forth on your Participation Agreement. Subject to any payment delay necessary to comply with Section 409A (as defined below), any restricted stock units, performance shares, performance units, and/or similar full value awards that vest under this paragraph will be settled on the 61st day following your Qualified Termination.

**Cash Severance**: Upon a Qualified Termination, you will be eligible to receive a lump-sum severance payment equal to a percentage set forth on your Participation Agreement of your Base Salary. Your severance payment will be paid in cash and in full on the 61st day following your Qualified Termination. If you die before all amounts have been paid, such unpaid amounts will be paid to your designated beneficiary, if living, or otherwise to your

personal representative in a lump-sum payment (less any withholding taxes) as soon as possible following your death.

**COBRA Benefit**: Upon a Qualified Termination, if you make a valid election under COBRA to continue your health coverage, the Company will (for a limited time set forth on your Participation Agreement) pay the cost of such continuation coverage for you and any eligible dependents that were covered under the Company's health care plans immediately prior to the date of your eligible termination ("**COBRA Benefit**"). Notwithstanding the preceding, if the Company determines in its sole discretion that it cannot provide the COBRA Benefit without potentially violating applicable law (including, without limitation, Section 2716 of the Public Health Service Act), the Company will instead provide you a taxable lump-sum payment in an amount equal to the applicable number of months of the COBRA Benefit *multiplied by* the monthly COBRA premium that you would be required to pay to continue your group health coverage in effect on the date of termination of employment (which amount will be based on the premium for the first month of COBRA coverage). If the Company provides for a taxable cash payment in lieu of the COBRA Benefit, then such cash payment will be made regardless of whether you elect COBRA continuation coverage and such payment will be made in full on the 61st day following your termination of employment.

**Release**: Notwithstanding any other term of this Policy, the receipt of any severance payments or benefits pursuant to this Policy is subject to your signing and not revoking the Company's then-standard separation agreement and release of claims (the "**Release**" and such requirement, the "**Release Requirement**"), which must become effective and irrevocable no later than the sixtieth (60th) day following your Qualified Termination (the "**Release Deadline**"). If the Release does not become effective and irrevocable by the Release Deadline, you will forfeit any right to severance payments or benefits under this Policy. In no event will severance payments or benefits be paid or provided until the Policy until the Release actually becomes effective and irrevocable.

For purposes of this Policy, the following terms shall have the following meanings:

"**Base Salary**" means your annual base salary as in effect immediately prior to your Qualified Termination date or, if greater, at the level in effect immediately prior to the Change of Control in the case of a COC Qualified Termination.

"**Board**" means the Board of Directors of the Company.

"**Cause**" means (a) your unauthorized use or disclosure of the Company's confidential information or trade secrets, which use or disclosure causes material harm to the Company; (b) your breach of any agreement between you and the Company; (c) your failure to comply with the Company's written policies or rules, including its code of conduct; (d) your conviction of, or plea of "guilty" or "no contest" to, a felony under the laws of the United States or any state thereof; (e) your gross negligence or willful misconduct in the performance of your duties; (f) your continuing failure to perform assigned duties after receiving written notification of the failure from the Board (or for Eligible Employees other than the Chief Executive Officer, from the Chief Executive Officer); or (g) your failure to cooperate in good faith with a governmental or internal investigation of the Company or its directors, officers or employees, if the Company has requested your cooperation; provided, however, that "Cause" will not be deemed to exist in the event of subsections (b), (c) or (f) above unless you have been provided with (i) 30 days' written notice by the Board or the act or omission constituting "Cause" and (ii) 30 days' opportunity to cure such act or omission, if capable of cure.

"**Change of Control**" means the occurrence of any of the following events:

    A. Change in Ownership of the Company. A change in the ownership of the Company which occurs on the date that any one person, or more than one person acting as a group ("**Person**"), acquires ownership of the stock of the Company that, together with the stock held by such Person, constitutes more than fifty percent (50%) of the total voting power of the stock of the Company; provided, however, that the

acquisition of additional stock by any one Person who is considered to own more than fifty percent (50%) of the total voting power of the stock of the Company will not be considered a Change of Control; or

B.  Change in Effective Control of the Company. If the Company has a class of securities registered pursuant to Section 12 of the Exchange Act, a change in the effective control of the Company which occurs on the date that a majority of members of the Board is replaced during any 12 month period by directors whose appointment or election is not endorsed by a majority of the members of the Board prior to the date of the appointment or election. For purposes of this clause (B), if any Person is considered to be in effective control of the Company, the acquisition of additional control of the Company by the same Person will not be considered a Change of Control; or

C.  Change in Ownership of a Substantial Portion of the Company's Assets. A change in the ownership of a substantial portion of the Company's assets which occurs on the date that any Person acquires (or has acquired during the 12 month period ending on the date of the most recent acquisition by such person or persons) assets from the Company that have a total gross fair market value equal to or more than 50% of the total gross fair market value of all of the assets of the Company immediately prior to such acquisition or acquisitions; provided, however, that for purposes of this subsection, the following will not constitute a change in the ownership of a substantial portion of the Company's assets: (i) a transfer to an entity that is controlled by the Company's stockholders immediately after the transfer, or (ii) a transfer of assets by the Company to: (a) a stockholder of the Company (immediately before the asset transfer) in exchange for or with respect to the Company's stock, (b) an entity, fifty percent (50%) or more of the total value or voting power of which is owned, directly or indirectly, by the Company, (c) a Person, that owns, directly or indirectly, fifty percent (50%) or more of the total value or voting power of all the outstanding stock of the Company, or (d) an entity, at least fifty percent (50%) of the total value or voting power of which is owned, directly or indirectly, by a Person.

Notwithstanding the foregoing, a transaction will not be deemed a Change of Control unless the transaction qualifies as a change in control event within the meaning of Section 409A (as defined below).

"**Change of Control Period**" means the period on, and twelve (12) months following, a Change of Control.

"**COBRA**" means the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended.

"**Disability**" means the total and permanent disability as defined in Section 22(e)(3) of the Code unless the Company maintains a long-term disability plan at the time of the Eligible Employee's termination, in which case, the determination of disability under such plan also will be considered "Disability" for purposes of this Policy.

"**Exchange Act**" means the Securities and Exchange Act of 1934, as amended.

"**Good Reason**" means your termination of employment within thirty (30) days following the "notice and cure period" in the next paragraph following the occurrence of one or more of the following events, without your express written consent: (a) a material adverse change in the nature or scope of your authority, powers, functions, duties, responsibilities, or reporting relationship (including ceasing to directly report to the chief executive officer or board of directors of a publicly traded entity, as applicable); (b) a material reduction by the Company in your rate of annual base salary; (c) the failure of the Company to continue any material compensation plan in which you are participating, unless you are permitted to participate in other plans providing you with substantially comparable compensation-related benefits, or the taking of any action by the Company which would adversely affect your participation in or materially reduce your compensation-related benefits under any such plan; or (d) the failure of the Company to obtain from any successor or transferee of the Company an express written and unconditional assumption of the Company's obligations under this agreement.

Your employment may be terminated by you for Good Reason only if an event or circumstance set forth the Good Reason definitions as specified in (a) through (d) above shall have occurred and you provide the Company with written notice thereof within ninety (90) days after you have knowledge of the occurrence or existence of such event or circumstance, which notice shall specifically identify the event or circumstance that you believe constitutes Good Reason, the Company fails to correct the circumstance or event so identified within thirty (30) days after the receipt of such notice, and you resign after the expiration of the cure period referenced in the preceding clause.

"**Involuntary Termination**" means a termination of employment by the Company other than for Cause, death or Disability or a termination of employment by you for Good Reason.

"**Participation Agreement**" means an agreement in the form attached hereto as <u>Exhibit A</u>.

**Section 409A**: The Company intends that all payments and benefits provided under this Policy or otherwise are exempt from, or comply with, the requirements of Section 409A of the Internal Revenue Code of 1986, as amended, and any guidance promulgated thereunder ("**Section 409A**") so that none of the payments or benefits will be subject to the additional tax imposed under Section 409A, and any ambiguities herein will be interpreted to so comply. No payment or benefits to be paid to you, if any, pursuant to this Policy or otherwise, when considered together with any other severance payments or separation benefits that are considered deferred compensation under Section 409A (together, the "**Deferred Payments**") will be paid or otherwise provided until you have a "separation from service" within the meaning of Section 409A. If, at the time of your termination of employment, you are a "specified employee" within the meaning of Section 409A and the payment of the Deferred Payments will be delayed to the extent necessary to avoid the imposition of the additional tax imposed under Section 409A, which generally means that you will receive payment on the first payroll date that occurs on or after the date that is 6 months and 1 day following your termination of employment. The Company reserves the right to amend the Policy as it deems necessary or advisable, in its sole discretion and without the consent of any Eligible Employee or any other individual, to comply with Section 409A the Code or to otherwise avoid income recognition under Section 409A prior to the actual payment of any benefits or imposition of any additional tax. Each payment, installment and benefit payable under this Policy is intended to constitute a separate payment for purposes of U.S. Treasury Regulation Section 1.409A-2(b)(2).

In no event will the Company reimburse you for any taxes that may be imposed on you as a result of Section 409A. Each payment and benefit payable hereunder is intended to constitute a separate payment for purposes of Section 1.409A-2(b)(2) of the Treasury Regulations.

**Parachute Payments**:

    **Reduction of Severance Benefits.** Notwithstanding anything set forth herein to the contrary, if any payment or benefit that an Eligible Employee would receive from the Company or any other party whether in connection with the provisions herein or otherwise (the "**Payment**") would (i) constitute a "parachute payment" within the meaning of Section 280G of the Internal Revenue Code of 1986, as amended (the "**Code**"), and (ii) but for this sentence, be subject to the excise tax imposed by Section 4999 of the Code (the "**Excise Tax**"), then such Payment shall be equal to the Best Results Amount. The "**Best Results Amount**" shall be either (x) the full amount of such Payment or (y) such lesser amount as would result in no portion of the Payment being subject to the Excise Tax, whichever of the foregoing amounts, taking into account the applicable federal, state and local employment taxes, income taxes and the Excise Tax, results in the Eligible Employee's receipt, on an after-tax basis, of the greater amount notwithstanding that all or some portion of the Payment may be subject to the Excise Tax. If a reduction in payments or benefits constituting "parachute payments" is necessary so that the Payment equals the Best Results Amount, reduction shall occur in the following order: reduction of cash payments; cancellation of accelerated vesting of stock awards; reduction of employee benefits. In the event that acceleration of vesting of stock award compensation is to be reduced, such acceleration of vesting shall

be cancelled in the reverse order of the date of grant of the Eligible Employee's stock awards unless the Eligible Employee elects in writing a different order for cancellation. The Eligible Employee shall be solely responsible for the payment of all personal tax liability that is incurred as a result of the payments and benefits received under this Policy, and the Eligible Employee will not be reimbursed by the Company for any such payments.

**Determination of Excise Tax Liability.** The Company shall select a professional services firm to make all of the determinations required to be made under these paragraphs relating to "Parachute Payments." The Company shall request that firm provide detailed supporting calculations both to the Company and the Eligible Employee prior to the date on which the event that triggers the Payment occurs if administratively feasible, or subsequent to such date if events occur that result in parachute payments to the Eligible Employee at that time. For purposes of making the calculations required under these paragraphs relating to "Parachute Payments," the firm may make reasonable assumptions and approximations concerning applicable taxes and may rely on reasonable, good faith determinations concerning the application of the Code. The Company and the Eligible Employee shall furnish to the firm such information and documents as the firm may reasonably request in order to make a determination under these paragraphs relating to "Parachute Payments." The Company shall bear all costs the firm may reasonably incur in connection with any calculations contemplated by these paragraphs relating to "Parachute Payments." Any such determination by the firm shall be binding upon the Company and the Eligible Employee, and the Company shall have no liability to the Eligible Employee for the determinations of the firm.

**Administration**: The Policy will be administered by the Compensation Committee or its delegate (in each case, an "**Administrator**"). The Administrator will have full discretion to administer and interpret the Policy. Any decision made or other action taken by the Administrator with respect to the Policy, and any interpretation by the Administrator of any term or condition of the Policy, or any related document, will be conclusive and binding on all persons and be given the maximum possible deference allowed by law. The Administrator is the "named fiduciary" of the Policy for purposes of ERISA and will be subject to the fiduciary standards of ERISA when acting in such capacity.

**Attorneys Fees**: The Company and each Eligible Employee bear their own attorneys' fees incurred in connection with any disputes between them.

**Exclusive Benefits**: Except as may be set forth in your Participation Agreement, this Policy is intended to be the only agreement between you and the Company regarding any severance payments or benefits to be paid to you on account of a termination of employment whether unrelated to, concurrent with, or following, a Change of Control. Accordingly, by executing your Participation Agreement, you hereby forfeit and waive any rights to any severance or change of control benefits set forth in any employment agreement, offer letter and/or equity award agreement, except as set forth in this Policy and/or in your Participation Agreement.

**Withholding**: The Company is authorized to withhold from any payments or benefits all federal, state, local and/or foreign taxes required to be withheld therefrom and any other required payroll deductions.

**Amendment or Termination**: The Company reserves the right to amend or terminate the Policy at any time, without advance notice to any Eligible Employee or other individual and without regard to the effect of the amendment or termination on any Eligible Employee or on any other individual. Notwithstanding the preceding, (a) any amendment to the Policy that causes an individual or group of individuals to cease to be an Eligible Employee will not be effective with respect to COC Qualified Terminations unless it is both approved by the Administrator and communicated to the affected individual(s) in writing at least 6 months prior to the effective date of the amendment or termination, and (b) no amendment or termination of the Policy shall be made within 12 months following a Change of Control to the extent that such amendment or reduction would reduce the benefits provided hereunder or impair an Eligible Employee's eligibility under the Policy (unless the affected

Eligible Employee consents to such amendment or termination). Any amendment or termination of the Policy will be in writing. Any action of the Company in amending or terminating the Policy will be taken in a non-fiduciary capacity.

**Claims Procedure**: Any Eligible Employee who believes he or she is entitled to any payment under the Policy may submit a claim in writing to the Administrator. If the claim is denied (in full or in part), the claimant will be provided a written notice explaining the specific reasons for the denial and referring to the provisions of the Policy on which the denial is based. The notice will also describe any additional information needed to support the claim and the Policy's procedures for appealing the denial. The denial notice will be provided within 90 days after the claim is received. If special circumstances require an extension of time (up to 90 days), written notice of the extension will be given within the initial 90-day period. This notice of extension will indicate the special circumstances requiring the extension of time and the date by which the Administrator expects to render its decision on the claim.

**Appeal Procedure**: If the claimant's claim is denied, the claimant (or his or her authorized representative) may apply in writing to the Administrator for a review of the decision denying the claim. Review must be requested within 60 days following the date the claimant received the written notice of their claim denial or else the claimant loses the right to review. The claimant (or representative) then has the right to review and obtain copies of all documents and other information relevant to the claim, upon request and at no charge, and to submit issues and comments in writing. The Administrator will provide written notice of the decision on review within 60 days after it receives a review request. If additional time (up to 60 days) is needed to review the request, the claimant (or representative) will be given written notice of the reason for the delay. This notice of extension will indicate the special circumstances requiring the extension of time and the date by which the Administrator expects to render its decision. If the claim is denied (in full or in part), the claimant will be provided a written notice explaining the specific reasons for the denial and referring to the provisions of the Policy on which the denial is based. The notice shall also include a statement that the claimant will be provided, upon request and free of charge, reasonable access to, and copies of, all documents and other information relevant to the claim and a statement regarding the claimant's right to bring an action under Section 502(a) of ERISA.

**Successors**: Any successor to the Company of all or substantially all of the Company's business and/or assets (whether direct or indirect and whether by purchase, merger, consolidation, liquidation or other transaction) will assume the obligations under the Policy and agree expressly to perform the obligations under the Policy the same manner and to the same extent as the Company would be required to perform such obligations in the absence of a succession. For all purposes under the Policy, the term "Company" will include any successor to the Company's business and/or assets which become bound by the terms of the Policy by operation of law, or otherwise.

**Applicable Law**: The provisions of the Policy will be construed, administered and enforced in accordance with ERISA and, to the extent applicable, the internal substantive laws of the state of California (but not its conflict of laws provisions).

**Additional Information.**

| | |
|---|---|
| **Plan Name:** | Twitter, Inc. Change of Control and Involuntary Termination Protection Policy |
| **Plan Sponsor:** | Twitter, Inc.<br>1355 Market St, Suite 900<br>San Francisco, CA 94103 |
| **Identification Numbers:** | |

| | |
|---|---|
| **Plan Year:** | Company's Fiscal Year |
| **Plan Administrator:** | Twitter, Inc. |
| | *Attention:* Administrator of the Twitter, Inc. Change of Control and Involuntary Termination Protection Policy |
| | 1355 Market St, Suite 900 |
| | San Francisco, CA 94103 |
| **Agent for Service of Legal Process:** | Twitter, Inc. |
| | *Attention:* General Counsel |
| | 1355 Market St, Suite 900 |
| | San Francisco, CA 94103 |
| | Service of process may also be made upon the Plan Administrator. |
| **Type of Plan** | Severance Plan/Employee Welfare Benefit Plan |
| **Plan Costs** | The cost of the Policy is paid by the Company. |

**Statement of ERISA Rights.**

Policy Eligible Employees have certain rights and protections under ERISA:

They may examine (without charge) all Policy documents, including any amendments and copies of all documents filed with the U.S. Department of Labor, such as the Policy's annual report (Internal Revenue Service Form 5500). These documents are available for review in the Company's Human Resources Department.

They may obtain copies of all Policy documents and other Policy information upon written request to the Plan Administrator. A reasonable charge may be made for such copies.

In addition to creating rights for Eligible Employees, ERISA imposes duties upon the people who are responsible for the operation of the Policy. The people who operate the Policy (called "fiduciaries") have a duty to do so prudently and in the interests of Eligible Employees. No one, including the Company or any other person, may fire or otherwise discriminate against an Eligible Employee in any way to prevent them from obtaining a benefit under the Policy or exercising rights under ERISA. If an Eligible Employee's claim for a severance benefit is denied, in whole or in part, they must receive a written explanation of the reason for the denial. An Eligible Employee has the right to have the denial of their claim reviewed. (The claim review procedure is explained above.)

Under ERISA, there are steps Eligible Employees can take to enforce the above rights. For instance, if an Eligible Employee requests materials and does not receive them within 30 days, they may file suit in a federal court. In such a case, the court may require the Administrator to provide the materials and to pay the Eligible Employee up to $110 a day until they receive the materials, unless the materials were not sent because of reasons beyond the control of the Plan Administrator. If an Eligible Employee has a claim which is denied or ignored, in whole or in part, he or she may file suit in a state or federal court. If it

should happen that an Eligible Employee is discriminated against for asserting their rights, he or she may seek assistance from the U.S. Department of Labor, or may file suit in a federal court.

In any case, the court will decide who will pay court costs and legal fees. If the Eligible Employee is successful, the court may order the person sued to pay these costs and fees. If the Eligible Employee loses, the court may order the Eligible Employee to pay these costs and fees, for example, if it finds that the claim is frivolous.

If an Eligible Employee has any questions regarding the Policy, please contact the Plan Administrator. If an Eligible Employee has any questions about this statement or about their rights under ERISA, they may contact the nearest area office of the Employee Benefits Security Administration (formerly the Pension and Welfare Benefits Administration), U.S. Department of Labor, listed in the telephone directory, or the Division of Technical Assistance and Inquiries, Employee Benefits Security Administration, U.S. Department of Labor, 200 Constitution Avenue, N.W. Washington, D.C. 20210. An Eligible Employee may also obtain certain publications about their rights and responsibilities under ERISA by calling the publications hotline of the Employee Benefits Security Administration.

## EXHIBIT A

### Change of Control and Involuntary Termination Protection Policy
### Participation Agreement

This Participation Agreement ("**Agreement**") is made and entered into by and between Nick Caldwell on the one hand, and Twitter, Inc. (the "**Company**") on the other.

## RECITALS

The Company adopted a Change of Control and Involuntary Termination Protection Policy (the "**Policy**") to assure that the Company will have the continued dedication and objectivity of the participants in the Policy.

The Company has designated you as eligible for protection under the Policy and this Agreement, subject to your qualifying as an Eligible Employee.

Unless otherwise defined herein, the terms defined in the Policy, which is hereby incorporated by reference, shall have the same defined meanings in this Agreement.

## AGREEMENT

**NOW, THEREFORE**, in consideration of the mutual covenants contained herein, the parties hereto agree as follows:

**COC Qualified Termination.**

You have been designated as an Eligible Employee for COC Qualified Terminations in the Policy, a copy of which is attached hereto, subject to your satisfying the criteria of being an Eligible Employee on the date of a COC Qualified Termination.

The terms and conditions of your participation in the Policy are as set forth in the Policy.

Your equity vesting benefit shall be                     50%

Your percentage of Base Salary shall be                  100%

Your COBRA benefit shall be                              12 months

**Non-COC Qualified Termination.**

If your employment is terminated by you or the Company in an Involuntary Termination that is a Non-COC Qualified Termination, you will be entitled to the following benefits, subject to your compliance with the Policy

Your equity vesting benefit shall be                     12.5%

Your percentage of Base Salary shall be                  100%

Your COBRA benefit shall be                                     6 months


**Other Provisions.**

You agree that the Policy constitutes the entire agreement of the parties hereto and supersedes in their entirety all prior representations, understandings, undertakings or agreements (whether oral or written and whether expressed or implied) of the parties, and shall specifically supersede any severance and/or change of control provisions of any offer letter, employment agreement, or equity award agreement entered into between the you and Company.

This Agreement may be executed in counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument.

        IN WITNESS WHEREOF, each of the parties has executed this Agreement, in the case of the Company by its duly authorized officer, as of the day and year set forth below.

TWITTER, INC.                           ELIGIBLE EMPLOYEE


                                        *Nicholas Caldwell*
By:_____        Signature:Nicholas Caldwell (May 11, 2022 18:56 PDT)

                                                 May 11, 2022
Date:_____        Date:_____



*[Signature Page of the Participation Agreement]*

# EXHIBIT 2

# TWITTER, INC.
## 2013 EQUITY INCENTIVE PLAN
### RESTRICTED STOCK UNIT AGREEMENT

Unless otherwise defined herein, the terms defined in the Twitter, Inc. 2013 Equity Incentive Plan (the "Plan") will have the same defined meanings in this Restricted Stock Unit Agreement (the "Award Agreement"), which includes the Notice of Restricted Stock Unit Grant (the "Notice of Grant") and Terms and Conditions of Restricted Stock Unit Grant, attached hereto as Exhibit A.

## NOTICE OF RESTRICTED STOCK UNIT GRANT

**Participant Name:**         Nicholas Caldwell

Participant has been granted the right to receive an Award of Restricted Stock Units, subject to the terms and conditions of the Plan and this Award Agreement, as follows:

| | |
|---|---|
| Grant Number | 10042030 |
| Date of Grant | December 14, 2021 |
| Vesting Commencement Date | February 01, 2022 |
| Number of Restricted Stock Units | 88,636 |

Vesting Schedule:

Subject to any acceleration provisions contained in the Plan or set forth below, the Restricted Stock Units will vest in accordance with the following schedule, provided the participant has been continuously employed by Twitter through such vesting date:

5,539 on February 01, 2022
5,540 on May 01, 2022
5,540 on August 01, 2022
5,540 on November 01, 2022
5,539 on February 01, 2023
5,540 on May 01, 2023
5,540 on August 01, 2023
5,540 on November 01, 2023
5,539 on February 01, 2024
5,540 on May 01, 2024
5,540 on August 01, 2024
5,540 on November 01, 2024
5,539 on February 01, 2025
5,540 on May 01, 2025

5,540  on  August  01, 2025
5,540  on  November  01, 2025

Notwithstanding  the  foregoing,  the  vesting  of  the  Restricted  Stock  Units  shall  be  subject to  any  vesting  acceleration  provisions  applicable  to  these  Restricted  Stock  Units  contained  in  the Plan  and/or  any  employment  or  service  agreement,  offer  letter,  change  in  control  severance agreement  or  policy,  or  any  other  agreement  or  policy  that,  prior  to  and  effective  as  of  the  date of  this  Agreement,  has  been  entered  into  or  agreed  upon,  as  the  case  may  be,  between  Participant and  the  Company  or  any  parent  or  subsidiary  corporation  of  the  Company  (such  agreement  or policy,  a  "Separate  Agreement")  to  the  extent  not  otherwise  duplicative  of  the  vesting  terms described  above  (by  way  of  example,  if  a  Separate  Agreement  provides  for  different  acceleration of  vesting  provisions  for  all  of  Participant's  Restricted  Stock  Units  upon  a  termination  of Participant  as  a  Service  Provider  for  "good  reason"  that  is  defined  differently,  and  the Participant's  status  as  a  Service  Provider  terminates  in  a  manner  that  would  trigger  "good reason"  under  the  Separate  Agreement  but  not  under  this  Agreement,  the  Participant  would remain  entitled  to  the  acceleration  of  vesting  under  the  Separate  Agreement).

In  the  event  Participant  ceases  to  be  a  Service  Provider  for  any  or  no  reason  before Participant  vests  in  the  Restricted  Stock  Units,  the  Restricted  Stock  Units  and  Participant's  right to  acquire  any  Shares  hereunder  will  immediately  terminate,  subject  to  Applicable  Laws.

By  Participant's  signature  and  the  signature  of  the  representative  of  Twitter,  Inc.  (the "Company")  below,  Participant  and  the  Company  agree  that  this  Award  of  Restricted  Stock Units  is  granted  under  and  governed  by  the  terms  and  conditions  of  the  Plan  and  this  Award Agreement,  including  the  Terms  and  Conditions  of  Restricted  Stock  Unit  Grant,  attached  hereto as  <u>Exhibit A</u>,  all  of  which  are  made  a  part  of  this  document.  Participant  has  reviewed  the  Plan and  this  Award  Agreement  in  their  entirety,  has  had  an  opportunity  to  obtain  the  advice  of counsel  prior  to  executing  this  Award  Agreement  and  fully  understands  all  provisions  of  the  Plan and  Award  Agreement.  Participant  hereby  agrees  to  accept  as  binding,  conclusive  and  final  all decisions  or  interpretations  of  the  Administrator  upon  any  questions  relating  to  the  Plan  and Award  Agreement.  Participant  further  agrees  to  notify  the  Company  upon  any  change  in  the residence  address  indicated  below.

PARTICIPANT:                                TWITTER,  INC.

*Signed by Online Electronic Agreement*

| | |
|---|---|
| Signature | By Ned Segal |
| Nicholas  Caldwell | Chief Financial  Officer |
| Print Name | Title |

Residence  Address:

## EXHIBIT A

## TERMS AND CONDITIONS OF RESTRICTED STOCK UNIT GRANT

      1.    Grant.  The Company hereby grants to the individual named in the Notice of Grant (the "Participant") under the Plan an Award of Restricted Stock Units, subject to all of the terms and conditions in this Award Agreement (which includes the attached Appendix), the Plan, and the Separate Agreement (as applicable), which are incorporated herein by reference.  Subject to Section 18(c) of the Plan, in the event of a conflict between the terms and conditions of the Plan and the terms and conditions of this Award Agreement, the terms and conditions of the Plan will prevail.

      2.    Company's Obligation to Pay.  Each Restricted Stock Unit represents the right to receive a Share on the date it vests.  Unless and until the Restricted Stock Units will have vested in the manner set forth in Sections 3 or 4, Participant will have no right to payment of any such Restricted Stock Units.  Prior to actual payment of any vested Restricted Stock Units, such Restricted Stock Units will represent an unsecured obligation of the Company, payable (if at all) only from the general assets of the Company.  Any Restricted Stock Units that vest in accordance with Sections 3 or 4 will be paid to Participant (or in the event of Participant's death, to his or her estate) in whole Shares, subject to Participant satisfying any obligations for Tax-Related Items (as defined in Section 7).  Subject to the provisions of Section 4, such vested Restricted Stock Units shall be paid in whole Shares as soon as practicable after vesting, but in each such case within the period sixty (60) days following the vesting date.  In no event will Participant be permitted, directly or indirectly, to specify the taxable year of the payment of any Restricted Stock Units payable under this Award Agreement.

      3.    Vesting Schedule.  Except as provided in Section 4, and subject to Section 5, the Restricted Stock Units awarded by this Award Agreement will vest in accordance with the vesting provisions set forth in the Notice of Grant.  Restricted Stock Units scheduled to vest on a certain date or upon the occurrence of a certain condition will not vest in Participant in accordance with any of the provisions of this Award Agreement, unless Participant will have been continuously a Service Provider from the Date of Grant until the date such vesting occurs.

In the event that the Participant is on an approved leave of absence, a 120-day grace period shall take effect following the end of the relevant policy term, where such policy and term is defined and subject to the Administrator's discretion, before vesting of the Restricted Stock Units will be suspended. Upon Participant's return to work, vesting will resume effective the 1st day of the month following Participant's return. The policy and the provisions above will not be applied if contrary to or in violation of applicable local laws.

      4.    Administrator Discretion.  The Administrator, in its discretion, may accelerate the vesting of the balance, or some lesser portion of the balance, of the unvested Restricted Stock Units at any time, subject to the terms of the Plan.  If so accelerated, such Restricted Stock Units will be considered as having vested as of the date specified by the Administrator.  The payment of Shares vesting pursuant to this Section 4 shall in all cases be paid at a time or in a manner that is exempt from, or complies with, Section 409A.

The following paragraphs in this Section 4 apply only if the Participant is a U.S. taxpayer or otherwise subject to U.S. taxation: Notwithstanding anything in the Plan or this Award Agreement to the contrary, if the vesting of the balance, or some lesser portion of the balance, of the Restricted Stock Units is accelerated in connection with Participant's termination as a Service Provider (provided that such termination is a "separation from service" within the meaning of Section 409A, as determined by the Company), other than due to death, and if (x) Participant is a "specified employee" within the meaning of Section 409A at the time of such termination as a Service Provider and (y) the payment of such accelerated Restricted Stock Units will result in the imposition of additional tax under Section 409A if paid to Participant on or within the six (6) month period following Participant's termination as a Service Provider, then the payment of such accelerated Restricted Stock Units will not be made until the date six (6) months and one (1) day following the date of Participant's termination as a Service Provider, unless Participant dies following his or her termination as a Service Provider, in which case, the Restricted Stock Units will be paid in Shares to Participant's estate as soon as practicable following his or her death. It is the intent of this Award Agreement that it and all payments and benefits hereunder be exempt from, or comply with, the requirements of Section 409A so that none of the Restricted Stock Units provided under this Award Agreement or Shares issuable thereunder will be subject to the additional tax imposed under Section 409A, and any ambiguities herein will be interpreted to be so exempt or so comply. Each payment payable under this Award Agreement is intended to constitute a separate payment for purposes of Treasury Regulation Section 1.409A-2(b)(2). For purposes of this Award Agreement, "Section 409A" means Section 409A of the Code, and any final Treasury Regulations and Internal Revenue Service guidance thereunder, as each may be amended from time to time.

5.  **Forfeiture upon Termination of Status as a Service Provider**. Except as otherwise provided for in Section 3, the balance of the Restricted Stock Units that have not vested as of the time of Participant's termination as a Service Provider for any or no reason and Participant's right to acquire any Shares hereunder will immediately terminate, subject to Applicable Laws. The date of Participant's termination as a Service Provider is detailed in Section 10(h).

6.  **Death of Participant**. Any distribution or delivery to be made to Participant under this Award Agreement will, if Participant is then deceased, be made to Participant's designated beneficiary, or if no beneficiary survives Participant, the administrator or executor of Participant's estate. Any such transferee must furnish the Company with (a) written notice of his or her status as transferee, and (b) evidence satisfactory to the Company to establish the validity of the transfer and compliance with any laws or regulations pertaining to said transfer.

7.  **Responsibility for Taxes**. Notwithstanding any contrary provision of this Award Agreement, no certificate representing the Shares will be issued to Participant, unless and until satisfactory arrangements (as determined by the Administrator) will have been made by Participant with respect to the payment of income, employment, social insurance, National Insurance Contributions, payroll tax, fringe benefit tax, payment on account or other tax-related items related to Participant's participation in the Plan and legally applicable to Participant, including, but not limited to, the grant, vesting or settlement of the Restricted Stock Units, the subsequent sale of Shares acquired pursuant to such settlement and the receipt of any dividends ("Tax-Related Items") which the Company determines must be withheld with respect to such

Shares.  Prior to vesting and/or settlement of the Restricted Stock Units, Participant will pay or make adequate arrangements satisfactory to the Company and/or Participant's employer (the "Employer") to satisfy all withholding and payment obligations of Tax-Related Items of the Company and/or the Employer.  In this regard, Participant authorizes the Company and/or the Employer to withhold any Tax-Related Items legally payable by Participant from his or her wages or other cash compensation paid to Participant by the Company and/or the Employer or from proceeds of the sale of Shares.  Alternatively, or in addition, if permissible under applicable local law, the Administrator, in its sole discretion and pursuant to such procedures as it may specify from time to time, may permit or require Participant to satisfy such tax withholding obligation, in whole or in part (without limitation) by (a) paying cash, (b) electing to have the Company withhold otherwise deliverable Shares having a Fair Market Value equal to the minimum amount required to be withheld, (c) selling a sufficient number of such Shares otherwise deliverable to Participant through such means as the Company may determine in its sole discretion (whether through a broker or otherwise) equal to the amount required to be withheld, or (d) if Participant is a U.S. employee, delivering to the Company already vested and owned Shares having a Fair Market Value equal to the amount required to be withheld.  To the extent determined appropriate by the Company in its discretion, it will have the right (but not the obligation) to satisfy any obligations for Tax-Related Items by reducing the number of Shares otherwise deliverable to Participant [and, until determined otherwise by the Company, this will be the method by which such tax withholding obligations are satisfied].  Further, if Participant is subject to tax in more than one jurisdiction between the Date of Grant and a date of any relevant taxable or tax withholding event, as applicable, Participant acknowledges and agrees that the Company and/or the Employer (or former employer, as applicable) may be required to withhold or account for tax in more than one jurisdiction.  If Participant fails to make satisfactory arrangements for the payment of any Tax-Related Items hereunder at the time any applicable Restricted Stock Units otherwise are scheduled to vest pursuant to Sections 3 or 4 or Tax-Related Items related to Restricted Stock Units otherwise are due, Participant will permanently forfeit such Restricted Stock Units and any right to receive Shares thereunder and the Restricted Stock Units will be returned to the Company at no cost to the Company.  Regardless of any action of the Company or the Employer, Participant acknowledges that the ultimate liability for all Tax-Related Items is and remains Participant's responsibility and may exceed the amount actually withheld by the Company or the Employer.  Participant further acknowledges that the Company and the Employer (1) make no representations or undertakings regarding the treatment of any Tax-Related Items in connection with any aspect of the Restricted Stock Units; and (2) do not commit to and are under no obligation to structure the terms of the grant or any aspect of the Restricted Stock Units to reduce or eliminate Participant's liability for Tax-Related Items or achieve any particular tax result.

8.      Rights as Stockholder.    Neither Participant nor any person claiming under or through Participant will have any of the rights or privileges of a stockholder of the Company in respect of any Shares deliverable hereunder unless and until certificates representing such Shares will have been issued, recorded on the records of the Company or its transfer agents or registrars, and delivered to Participant.  After such issuance, recordation and delivery, Participant will have all the rights of a stockholder of the Company with respect to voting such Shares and receipt of dividends and distributions on such Shares.

9.      No Guarantee of Continued Service.  PARTICIPANT ACKNOWLEDGES AND AGREES THAT THE VESTING OF THE RESTRICTED STOCK UNITS PURSUANT TO THE VESTING SCHEDULE HEREOF IS EARNED ONLY BY CONTINUING AS A SERVICE PROVIDER AT THE WILL OF THE COMPANY (OR THE PARENT OR SUBSIDIARY EMPLOYING OR RETAINING PARTICIPANT) AND NOT THROUGH THE ACT OF BEING HIRED, BEING GRANTED THIS AWARD OF RESTRICTED STOCK UNITS OR ACQUIRING SHARES HEREUNDER.  PARTICIPANT FURTHER ACKNOWLEDGES AND AGREES THAT THIS AWARD AGREEMENT, THE TRANSACTIONS CONTEMPLATED HEREUNDER AND THE VESTING SCHEDULE SET FORTH HEREIN DO NOT CONSTITUTE AN EXPRESS OR IMPLIED PROMISE OF CONTINUED ENGAGEMENT AS A SERVICE PROVIDER FOR THE VESTING PERIOD, FOR ANY PERIOD, OR AT ALL, AND WILL NOT INTERFERE IN ANY WAY WITH PARTICIPANT'S RIGHT OR THE RIGHT OF THE COMPANY (OR THE PARENT OR SUBSIDIARY EMPLOYING OR RETAINING PARTICIPANT) TO TERMINATE PARTICIPANT'S RELATIONSHIP AS A SERVICE PROVIDER AT ANY TIME, WITH OR WITHOUT CAUSE, SUBJECT TO APPLICABLE LAWS.

10.     Nature of Grant.   In accepting the grant, Participant acknowledges, understands and agrees that:

(a) the Plan is established voluntarily by the Company, it is discretionary in nature and it may be modified, amended, suspended or terminated by the Company at any time, to the extent permitted by the Plan;

(b) the grant of the Restricted Stock Units is voluntary and occasional and does not create any contractual or other right to receive future grants of Restricted Stock Units, or benefits in lieu of Restricted Stock Units, even if Restricted Stock Units have been granted in the past;

(c) all decisions with respect to future Restricted Stock Units or other grants, if any, will be at the sole discretion of the Company;

(d) Participant is voluntarily participating in the Plan;

(e) the Restricted Stock Units and the Shares subject to the Restricted Stock Units are not intended to replace any pension rights or compensation;

(f) the Restricted Stock Units and the Shares subject to the Restricted Stock Units, and the income and value of same, are not part of normal or expected compensation for purposes of calculating any severance, resignation, termination, redundancy, dismissal, end-of-service payments, bonuses, long-service awards, pension or retirement or welfare benefits or similar payments;

(g) the future value of the underlying Shares is unknown, indeterminable and cannot be predicted with certainty;

(h) for purposes of the Restricted Stock Units, Participant's status as a Service Provider will be considered terminated as of the date Participant is no longer actively providing services to the Company or any Parent or Subsidiary (regardless of the reason for such termination and whether or not later to be found invalid or in breach of employment laws in the jurisdiction where Participant is a Service Provider or the terms of Participant's service agreement, if any), and unless otherwise expressly provided in this Award Agreement or determined by the Administrator, Participant's right to vest in the Restricted Stock Units under the Plan, if any, will terminate as of such date and will not be extended by any notice period (*e.g.*, Participant's period of service would not include any contractual notice period or any period of "garden leave" or similar period mandated under employment laws in the jurisdiction where Participant is a Service Provider or the terms of Participant's service agreement, if any, unless Participant is providing bona fide services during such time); the Administrator shall have the exclusive discretion to determine when Participant is no longer actively providing services for purposes of the Restricted Stock Units grant (including whether Participant may still be considered to be providing services while on a leave of absence);

(i) unless otherwise provided in the Plan or by the Company in its discretion, the Restricted Stock Units and the benefits evidenced by this Award Agreement do not create any entitlement to have the Restricted Stock Units or any such benefits transferred to, or assumed by, another company nor be exchanged, cashed out or substituted for, in connection with any corporate transaction affecting the Shares; and

(j) the following provisions apply only if Participant is providing services outside the United States:

   i. the Restricted Stock Units and the Shares subject to the Restricted Stock Units are not part of normal or expected compensation or salary for any purpose;

   ii. Participant acknowledges and agrees that none of the Company, the Employer, or any Parent or Subsidiary shall be liable for any foreign exchange rate fluctuation between Participant's local currency and the United States Dollar that may affect the value of the Restricted Stock Units or of any amounts due to Participant pursuant to the settlement of the Restricted Stock Units or the subsequent sale of any Shares acquired upon settlement; and

   iii. no claim or entitlement to compensation or damages shall arise from forfeiture of the Restricted Stock Units resulting from the termination of Participant's status as a Service Provider (for any reason whatsoever whether or not later found to be invalid or in breach of employment laws in the jurisdiction where Participant is a Service Provider or the terms of

Participant's service agreement, if any), and in consideration of the grant of the Restricted Stock Units to which Participant is otherwise not entitled, Participant irrevocably agrees never to institute any claim against the Company, any Subsidiary or the Employer, waives his or her ability, if any, to bring any such claim, and releases the Company, any Parent, any Subsidiary and the Employer from any such claim; if, notwithstanding the foregoing, any such claim is allowed by a court of competent jurisdiction, then, by participating in the Plan, Participant shall be deemed irrevocably to have agreed not to pursue such claim and agrees to execute any and all documents necessary to request dismissal or withdrawal of such claim.

11.    No Advice Regarding Grant.  The Company is not providing any tax, legal or financial advice, nor is the Company making any recommendations or assessments regarding Participant's participation in the Plan, or Participant's acquisition or sale of the underlying Shares.  Participant is hereby advised to consult with his or her own personal tax, legal and financial advisors regarding his or her participation in the Plan before taking any action related to the Plan.

12.    **Data Privacy.**  *Participant understands that the Company and the Employer may collect, where permissible under Applicable Law certain personal information about Participant, including, but not limited to, Participant's name, home address and telephone number, date of birth, social insurance number or other identification number, salary, nationality, job title, any Shares or directorships held in the Company, details of all Restricted Stock Units granted under the Plan or any other entitlement to Shares awarded, canceled, vested, unvested or outstanding in Participant's favor ("Data"), for the exclusive purpose of implementing, administering and managing the Plan.  Participant understands that Company may transfer Participant's Data to the United States, which is not considered by the European Commission to have data protection laws equivalent to the laws in Participant's country.  The Company therefore maintains an EU-US Safe Harbor certification to protect Participant's data consistent with data protection laws of the EU.*

*Participant understands that the Company will transfer Participant's Data to its designated broker, or such other stock plan service provider as may be selected by the Company in the future, which is assisting the Company with the implementation, administration and management of the Plan.  Participant understands that the recipients of the Data may be located in the United States or elsewhere, and that a recipient's country of operation (e.g., the United States) may have different data privacy laws that the European Commission or Participant's jurisdiction does not consider to be equivalent to the protections in Participant's country.  Participant understands that Participant may request a list with the names and addresses of any potential recipients of the Data by contacting Participant's local human resources representative. Participant authorizes the Company, the Company's designated broker and any other possible recipients which may assist the Company with implementing, administering and managing the Plan to receive, possess, use, retain and transfer the Data, in electronic or other form, for the sole purpose of implementing, administering and managing Participant's participation in the Plan.  Participant understands that Data will be held only as long as is necessary to implement,*

*administer and manage Participant's participation in the Plan. Participant understands that Participant may, at any time, view Data, request additional information about the storage and processing of Data, require any necessary amendments to Data or refuse or withdraw the consents herein, in any case without cost, by contacting in writing Participant's local human resources representative. Further, Participant understands that Participant is providing the consents herein on a purely voluntary basis. If Participant does not consent, or if Participant later seeks to revoke Participant's consent, Participant's employment status or career with the Company or the Employer will not be adversely affected; the only adverse consequence of refusing or withdrawing Participant's consent is that the Company would not be able to grant Participant Restricted Stock Units under the Plan or other equity awards, or administer or maintain such awards. Therefore, Participant understands that refusing or withdrawing Participant's consent may affect Participant's ability to participate in the Plan. For more information on the consequences of Participant's refusal to consent or withdrawal of consent, Participant understands that Participant may contact Participant's local human resources representative.*

*Participant understands that Participant has the right to access, and to request a copy of, the Data held about Participant. Participant also understands that Participant has the right to discontinue the collection, processing, or use of Participant's Data, or supplement, correct, or request deletion of Participant's Data. To exercise Participant's rights, Participant may contact Participant's local human resources representative.*

*Participant hereby explicitly and unambiguously consents to the collection, use and transfer, in electronic or other form, of Participant's personal data as described in the Award Agreement and any other Plan materials by and among, as applicable, the Employer, the Company and its Parents, Subsidiaries and affiliates for the exclusive purpose of implementing, administering and managing Participant's participation in the Plan. Participant understands that Participant's consent will be sought and obtained for any processing or transfer of Participant's data for any purpose other than as described in the Award Agreement and any other plan materials.*

      13.   <u>Address for Notices</u>. Any notice to be given to the Company under the terms of this Award Agreement will be addressed to the Company at Twitter, Inc., 1355 Market Street, Suite 900, San Francisco, CA 94103, or at such other address as the Company may hereafter designate in writing.

      14.   <u>Grant is Not Transferable</u>. Except to the limited extent provided in Section 6, this grant and the rights and privileges conferred hereby will not be transferred, assigned, pledged or hypothecated in any way (whether by operation of law or otherwise) and will not be subject to sale under execution, attachment or similar process. Upon any attempt to transfer, assign, pledge, hypothecate or otherwise dispose of this grant, or any right or privilege conferred hereby, or upon any attempted sale under any execution, attachment or similar process, this grant and the rights and privileges conferred hereby immediately will become null and void.

      15.   <u>Binding Agreement</u>. Subject to the limitation on the transferability of this grant contained herein, this Award Agreement will be binding upon and inure to the benefit of the heirs, legatees, legal representatives, successors and assigns of the parties hereto.

16.     <u>Additional Conditions to Issuance of Stock</u>.   If at any time the Company will determine, in its discretion, that the listing, registration, qualification or rule compliance of the Shares upon any securities exchange or under any state, federal or foreign law, the tax code and related regulations or the consent or approval of any governmental regulatory authority is necessary or desirable as a condition to the issuance of Shares to Participant (or his or her estate) hereunder, such issuance will not occur unless and until such listing, registration, qualification, rule compliance, consent or approval will have been completed, effected or obtained free of any conditions not acceptable to the Company.   Where the Company determines that the delivery of the payment of any Shares will violate federal securities laws or other applicable laws, the Company will defer delivery until the earliest date at which the Company reasonably anticipates that the delivery of Shares will no longer cause such violation.   The Company will make all reasonable efforts to meet the requirements of any such state, federal or foreign law or securities exchange and to obtain any such consent or approval of any such governmental authority or securities exchange.

17.     <u>Award Agreement Governs</u>.   This Award Agreement is subject to all terms and provisions of the Plan.   In the event of a conflict between one or more provisions of this Award Agreement and one or more provisions of the Plan, the provisions of the Award Agreement will govern.   Capitalized terms used and not defined in this Award Agreement will have the meaning set forth in the Plan.

18.     <u>Administrator Authority</u>.   The Administrator will have the power to interpret the Plan and this Award Agreement and to adopt such rules for the administration, interpretation and application of the Plan as are consistent therewith and to interpret or revoke any such rules (including, but not limited to, the determination of whether or not any Restricted Stock Units have vested).   All actions taken and all interpretations and determinations made by the Administrator in good faith will be final and binding upon Participant, the Company and all other interested persons.   No member of the Administrator will be personally liable for any action, determination or interpretation made in good faith with respect to the Plan or this Award Agreement.

19.     <u>Electronic Delivery and Acceptance</u>.   The Company may, in its sole discretion, decide to deliver any documents related to Restricted Stock Units awarded under the Plan or future Restricted Stock Units that may be awarded under the Plan by electronic means or request Participant's consent to participate in the Plan by electronic means.   Such means of electronic delivery may include but do not necessarily include the delivery of a link to a Company intranet or the Internet site of a third party involved in administering the Plan, the delivery of the document via e-mail or such other means of electronic delivery specified by the Company. Participant consents to the electronic delivery of the Plan and this Award Agreement.   Participant acknowledges that he or she may receive from the Company a paper copy of any documents delivered electronically at no cost to Participant by contacting the Company by telephone or in writing.   Participant further acknowledges that Participant will be provided with a paper copy of any documents if the attempted electronic delivery of such documents fails.   Similarly, Participant understands that Participant must provide the Company or any designated third party administrator with a paper copy of any documents if the attempted electronic delivery of such documents fails.   Participant may revoke his or her consent to the electronic delivery of

documents or may change the electronic mail address to which such documents are to be delivered (if Participant has provided an electronic mail address) at any time by notifying the Company of such revoked consent or revised e-mail address by telephone, postal service or electronic mail.   Finally, Participant understands that he or she is not required to consent to electronic delivery of documents.

20.   <u>Language</u>.   If Participant has received this Award Agreement or any other document related to the Plan translated into a language other than English and if the meaning of the translated version is different than the English version, the English version will control, subject to Applicable Laws.

21.   <u>Captions</u>.   Captions provided herein are for convenience only and are not to serve as a basis for interpretation or construction of this Award Agreement.

22.   <u>Agreement Severable</u>.   In the event that any provision in this Award Agreement will be held invalid or unenforceable, such provision will be severable from, and such invalidity or unenforceability will not be construed to have any effect on, the remaining provisions of this Award Agreement.

23.   <u>Amendment, Suspension or Termination of the Plan</u>.   By accepting this Award, Participant expressly warrants that he or she has received an Award of Restricted Stock Units under the Plan, and has received, read and understood a description of the Plan.   Participant understands that the Plan is discretionary in nature and may be amended, suspended or terminated by the Company at any time.

24.   <u>Governing Law and Venue</u>.   This Award Agreement will be governed by the laws of Delaware without giving effect to the conflict of law principles thereof.   For purposes of litigating any dispute that arises under this Award of Restricted Stock Units or this Award Agreement, the parties hereby submit to and consent to the jurisdiction of the State of California, and agree that such litigation will be conducted in the courts of the County of San Francisco, California, or the federal courts for the United States for the Northern District of California, and no other courts, where this Award of Restricted Stock Units is made and/or to be performed.

25.   <u>Country-Specific Terms and Conditions and Notices</u>.   Notwithstanding any provisions in this Award Agreement, the Restricted Stock Unit grant shall be subject to any special terms and conditions set forth in any appendix to this Award Agreement for Participant's country (the "Appendix").   Moreover, if Participant relocates to one of the countries included in the Appendix, the special terms and conditions for such country will apply to Participant unless determined otherwise by the Company.

26.   <u>Modifications to the Award Agreement</u>.   The Plan and this Award Agreement constitutes the entire understanding of the parties on the subjects covered.   Participant expressly warrants that he or she is not accepting this Award Agreement in reliance on any promises, representations, or inducements other than those contained herein.   Modifications to this Award Agreement or the Plan can be made only in an express written contract executed by a duly authorized officer of the Company.   Notwithstanding anything to the contrary in the Plan or this Award Agreement, the Company reserves the right to revise the Award Agreement as it deems

necessary or advisable, in its sole discretion and without the consent of Participant, subject to Applicable Laws, to comply with Section 409A or to otherwise avoid imposition of any additional tax or income recognition under Section 409A in connection to this Award of Restricted Stock Units.

27.     <u>Waiver</u>.  Participant acknowledges that a waiver by the Company of breach of any provision of this Award Agreement shall not operate or be construed as a waiver of any other provision of this Award Agreement, or of any subsequent breach by Participant or any other Participant.

## APPENDIX

### TO THE TWITTER, INC.
### RESTRICTED STOCK UNIT AWARD AGREEMENT UNDER THE
### 2013 EQUITY INCENTIVE PLAN

#### *Terms and Conditions*

This Appendix includes additional terms and conditions that govern the Restricted Stock Units granted to Participant under the Plan if he or she resides in one of the countries listed below. Certain capitalized terms used but not defined in this Appendix have the meanings set forth in the Plan and/or the main body of the Award Agreement.

#### *Notifications*

This Appendix also includes information regarding exchange controls and certain other issues of which Participant should be aware with respect to his or her participation in the Plan. The information is based on the securities, exchange control and other laws in effect in the respective countries as of February 2019. Such laws are often complex and change frequently. As a result, the Company strongly recommends that Participant not rely on the information in this Appendix as the only source of information relating to the consequences of Participant's participation in the Plan because the information may be out of date at the time Participant vests in the Shares or sells the Shares acquired under the Plan.

In addition, the information contained herein is general in nature and may not apply to Participant's particular situation and the Company is not in a position to assure Participant of any particular result. Accordingly, Participant is advised to seek appropriate professional advice as to how the relevant laws of Participant's country may apply to his or her situation.

Finally, if Participant is a citizen or resident of a country other than the one in which Participant is currently working or transfers to another country after the grant of the Restricted Stock Units, or is considered a resident of another country for local law purposes, the information contained herein may not be applicable to Participant in the same manner. In addition, the Company shall, in its discretion, determine to what extent the terms and conditions contained herein shall apply to Participant under these circumstances.

# AUSTRALIA

*Notifications*

**Securities Law Information**.  The offering and resale of Shares acquired under the Plan to a person or entity resident in Australia may be subject to disclosure requirements under Australian law.  The Participant should obtain legal advice regarding any applicable disclosure requirements prior to making any such offer.

*Terms and Conditions*

**Australian Securities Laws.**  If Participant acquires Shares under the Plan and resells them in Australia, he or she may be required to comply with certain Australian securities law disclosure requirements.

**Foreign Exchange**.  Participant acknowledges and agrees that it is the Participant's sole responsibility to investigate and comply with any applicable exchange control laws in connection with the inflow of funds from the vesting of the Restricted Stock Units or subsequent sale of the Shares and any dividends (if any) and that the Participant shall be responsible for any reporting of inbound international fund transfers required under applicable law.  The Participant is advised to seek appropriate professional advice as to how the exchange control regulations apply to the Participant's specific situation.

# BELGIUM

*Notifications*

**Foreign Asset/Account Reporting Information.**  Participant is required to report any security or bank accounts (including brokerage accounts) he or she maintains outside of Belgium on his or her annual tax return.  In a separate report, Participant is required to provide the National Bank of Belgium with certain details regarding such foreign accounts (including the account number, bank name and country in which any such account was opened).  This report, as well as additional information on how to complete it, can be found on the website of the National Bank of Belgium,  www.nbb.be,  under Kredietcentrales / Centrales des crédits caption.

# BRAZIL

*Terms and Conditions*

**Compliance with Laws.**   By accepting the Restricted Stock Units, Participant acknowledges that Participant agrees to comply with applicable Brazilian laws and to report and pay any and all applicable Tax-Related Items associated with the vesting of the Restricted Stock Units, the sale of the Shares acquired pursuant thereto and the receipt of any dividends.   That Participant agrees that, for all legal purposes: (i) the benefits provided under the Plan are the result of commercial transactions unrelated to the Participant's employment; (ii) the Plan is not a part of the terms and conditions of the Participant's employment; and (iii) the income from the Restricted Stock Units, if any, is not part of the Participant's remuneration from employment.

*Notifications*

**Exchange Control Information.**   If Participant is resident or domiciled in Brazil, Participant will be required to submit an annual declaration of assets and rights held outside of Brazil to the Central Bank of Brazil if the aggregate value of such assets and rights equals or exceeds US$100,000.   Assets and rights that must be reported include, but are not limited to, the Shares acquired under the Plan.

# CANADA

## Terms and Conditions

**Restricted Stock Units Payable Only in Shares**.   Notwithstanding anything to the contrary in the Plan or Award Agreement, the grant of Restricted Stock Units does not provide any right for Participant to receive a cash payment, and the Restricted Stock Units are payable in Shares only.

**Termination of Continuous Service Status**.   In the event of Participant's termination (for any reason whatsoever, whether or not later found to be invalid and whether or not in breach of employment laws in the jurisdiction where Participant is employed or the terms of Participant's employment or service agreement, if any), Participant's right to vest in the Restricted Stock Units under the Plan, if any, will terminate effective as of (1) the date that the Participant is no longer actively employed or providing services to the Company or the Parent or Subsidiary employing or retaining Participant, or at the discretion of the Administrator, (2) the date the Participant receives notice of Termination from the Company or the Parent or Subsidiary employing or retaining Participant, if earlier than (1), regardless of any notice period or period of pay in lieu of such notice required under local law (including, but not limited to statutory law, regulatory law and/or common law); the Administrator shall have the exclusive discretion to determine when Participant is no longer actively employed or providing services for purposes of Participant's RSU grant (including, but not limited to, whether Participant may still be considered actively employed or providing services while on an approved leave of absence).

**The following provisions apply if Participant is a resident of Quebec:**

**Language Consent.**   The parties acknowledge that it is their express wish that this Agreement, as well as all documents, notices and legal proceedings entered into, given or instituted pursuant hereto or relating directly or indirectly hereto, be drawn up in English.

*Les parties reconnaissent avoir expressement souhaité que la convention ["Award Agreement"], ainsi que tous les documents, avis et procédures judiciaires, exécutés, donnés ou intentés en vertu de, ou lié, directement ou indirectement à la présente convention, soient rédigés en langue anglaise.*

**Data Privacy Notice and Consent.**   This provision supplements Section 12 (Data Privacy) of Exhibit A the Award Agreement:

Participant hereby authorizes the Company and the Company's representatives to discuss with and obtain all relevant information from all personnel, professional or not, involved in the administration and operation of the Plan.   Participant further authorizes the Company and any Subsidiary or affiliate and the Administrator to disclose and discuss the Plan with their advisors. Participant further authorizes the Company and any Subsidiary or affiliate to record such information and to keep such information in Participant's employee file.

**COLOMBIA**

*Notifications*

**Exchange Control Information.** Foreign investments must be registered with the Central Bank (*Banco de la República*) as foreign investments held abroad if the funds used to acquire the foreign investments are not remitted through an authorized local finance institution and the employee's aggregate investments held (as of December 31 of the applicable year) equal or exceed US$500,000. Registration is undertaken via lodgment of Form 11, and must be filed by June 30 of the year following that in which the investment was made.

Upon sale or other disposition of investments (including shares of Stock) which have been registered with the Central Bank, the registration with the Central Bank must be cancelled no later than March 31 of the year following the sale or disposition (or a fine of up to 200% of the value of the infringing payment will apply). When investments held abroad are sold or otherwise disposed of, regardless of whether they have been registered with the Central Bank, Participant must repatriate the proceeds to Colombia by selling currency to a Colombian bank and filing the appropriate form.

**FRANCE**

*Terms and Conditions*

**Language Consent.** By accepting the grant, Participant confirms having read and fully understood the Plan and the Award Agreement which were provided in the English language. Participant accepts the terms of those documents accordingly.

***Consentement Relatif à la Langue Utilisée.*** *En acceptant l'attribution, le Participant confirme avoir lu et compris le Plan et le Contrat, qui ont été communiqués en langue anglaise. Le Participant accepte les termes de ces documents en connaissance de cause.*

*Notifications*

**Tax Reporting Information.** If Participant holds Shares outside of France or maintains a foreign bank account, Participant is required to report such to the French tax authorities when filing his or her annual tax return.

**Tax Information.** The Restricted Stock Units are not intended to qualify as a French tax qualified restricted stock units under French tax law.

**Foreign Asset/Account Reporting Information.** If Participant is a French resident and holds cash or shares of Common Stock outside of France, he or she must declare all foreign bank and brokerage accounts (including any accounts that were opened or closed during the tax year) on an annual basis on a special form, No. 3916, together with his or her income tax return. Further, if Participant is a French resident with foreign account balances exceeding €1,000,000, he or she

may have additional monthly reporting obligations.

# GERMANY

*Notifications*

**Exchange Control Information.**   If Participant remits proceeds in excess of €12,500 out of or into Germany, such cross-border payment must be reported monthly to the State Central Bank. In the event that Participant makes or receives a payment in excess of this amount, if Participant uses a German bank, the bank will make the report for him or her. Participant must report any receivables, payables, or debts in foreign currency exceeding an amount of €5,000,000 on a monthly basis.

# HONG KONG

*Terms and Conditions*

**Restricted Stock Units Settled in Shares Only.**   Notwithstanding any discretion contained in the Plan, or any provision in the Agreement to the contrary, Restricted Stock Units shall be paid in Shares only and do not provide any right for Participant to receive a cash payment.

**Sale of Shares.**   In the event Participant's Restricted Stock Units vest and Shares are issued to him or her within six months of the Date of Grant, he or she agrees that he or she will not dispose of any Shares acquired prior to the six-month anniversary of the Date of Grant.

**Securities Law Information.**   *Warning:  The Restricted Stock Units and the Shares issued at vesting do not constitute a public offering of securities under Hong Kong law and are available only to employees of the Company, and its Subsidiaries or affiliates.  The Agreement, including this Appendix, the Plan and other incidental communication materials have not been prepared in accordance with and are not intended to constitute a "prospectus" for a public offering of securities under the applicable securities legislation in Hong Kong.  Nor have the documents been reviewed by any regulatory authority in Hong Kong.  The Restricted Stock Units are intended only for the personal use of each eligible employee of the Employer, the Company or any Subsidiary or affiliate and may not be distributed to any other person.  If Participant is in any doubt about any of the contents of the Agreement, including this Appendix, or the Plan, he or she should obtain independent professional advice.*

**Nature of Scheme.**   The Company specifically intends that the Plan will not be an occupational retirement scheme for purposes of the Occupational Retirement Schemes Ordinance.

# INDIA

*Notifications*

**Exchange Control Information.** Participant understands and agrees that he or she must repatriate any proceeds from cash settlement or the sale of Shares acquired under the Plan to India and convert the proceeds into local currency within 90 days of receipt. Participant will receive a foreign inward remittance certificate ("FIRC") from the bank where he or she deposits the foreign currency. Participant should maintain the FIRC as evidence of the repatriation of funds in the event the Reserve Bank of India or his or her employer requests proof of repatriation.

**Tax Information.** To determine the Tax-Related Items, the Company or the Participant's Indian employer must obtain a valuation from a Merchant Banker in India. Neither the Company nor the Indian employer is under any obligation to obtain a valuation at a particular price nor are they required to obtain a valuation more frequently than every 180 days.

**Foreign Asset/Account Reporting Information.** Participant is required to declare in his or her annual tax return (a) any foreign assets held by Participant (e.g., Shares acquired under the Plan and, possibly, the Award), and (b) any foreign bank accounts for which Participant has signing authority.

# INDONESIA

*Notifications*

**Exchange Control Information.** If Participant remits proceeds from the sale of Shares into Indonesia, the Indonesian bank through which the transaction is made will submit a report on the transaction to the Bank of Indonesia for statistical reporting purposes. For transactions of US$25,000 or more, a description of the transaction must be included in the report. Although the bank through which the transaction is made is required to make the report, Participant must complete a "Transfer Report Form." The Transfer Report Form should be provided to Participant by the bank through which the transaction is made.

# IRELAND

*Notifications*

**Director Notification Obligation.** Participant acknowledges that if he or she is a director, shadow director or secretary of an Irish Subsidiary, Participant must notify the Irish Subsidiary in writing within five business days of receiving or disposing of an interest exceeding 1% of the Company (e.g., the Restricted Stock Units, shares, etc.), or within five business days of

becoming aware of the event giving rise to the notification requirement or within five business days of becoming a director or secretary if such an interest exists at the time.  This notification requirement also applies with respect to the interests of Participant's spouse or children under the age of 18 (whose interests will be attributed to Participant if Participant is a director, shadow director or secretary).

## ITALY

### *Terms and Conditions*

**Authorization to Release and Transfer Necessary Personal Information. This provision replaces in its entirety Section 12 (Data Privacy) of the Exhibit A of the Award Agreement:**

*Participant understands that his or her employer (the "Employer") and/or the Company may hold certain personal information about him or her, including, but not limited to, his or her name, home address and telephone number, date of birth, social security number (or any other social or national identification number), salary, nationality, job title, number of shares held and the details of all Restricted Stock Units granted or any other entitlement to shares awarded, cancelled, exercised, vested, unvested or outstanding (the "Data") for the purpose of implementing, administering and managing Participant's participation in the Plan. Participant is aware that providing the Company with his or her Data is necessary for the performance of this Agreement and that his or her refusal to provide such Data would make it impossible for the Company to perform its contractual obligations and may affect his or her ability to participate in the Plan.*

*The Controller of personal data processing is Twitter, Inc. 1355 Market Street, Suite 900, San Francisco, CA USA, and, pursuant to D.lgs 196/2003, its representative in Italy is with registered offices at Via Barbara Strozzilaan 201, 1083 HN Amsterdam. Participant understands that the Data may be transferred to the Company or any of its Subsidiaries or affiliates, or to any third parties assisting in the implementation, administration and management of the Plan, including any transfer required to a broker or other third party with whom shares acquired pursuant to the vesting of the Restricted Stock Units or cash from the sale of such shares may be deposited. Furthermore, the recipients that may receive, possess, use, retain and transfer such Data for the above mentioned purposes may be located in Italy or elsewhere, including outside of the European Union and that the recipients' country (e.g., the United States) may have different data privacy laws and protections than Participant's country. The processing activity, including the transfer of Participant's personal data abroad, outside of the European Union, as herein specified and pursuant to applicable laws and regulations, does not require Participant's consent thereto as the processing is necessary for the performance of contractual obligations related to the implementation, administration and management of the Plan. Participant understands that Data processing relating to the purposes above specified shall take place under automated or non-automated conditions, anonymously when possible, that comply with the purposes for which Data are collected and with confidentiality and security provisions as set forth by applicable laws and regulations, with specific reference to D.lgs. 196/2003.*

*Participant understands that Data will be held only as long as is required by law or as necessary to*

-22-

*implement, administer and manage Participant's participation in the Plan. Participant understands that pursuant to art. 7 of D.Igs 196/2003, he or she has the right, including but not limited to, access, delete, update, request the rectification of his or her Data and cease, for legitimate reasons, the Data processing. Furthermore, Participant is aware that his or her Data will not be used for direct marketing purposes. In addition, the Data provided can be reviewed and questions or complaints can be addressed by contacting a local representative available at the following address: Via Barbara Strozzilaan 201, 1083 HN Amsterdam.*

**Plan Document Acknowledgment.** In accepting the Restricted Stock Units, Participant acknowledges that he or she has received a copy of the Plan and the Agreement and has reviewed the Plan and the Award Agreement, including this Appendix, in their entirety and fully understands and accepts all provisions of the Plan and the Award Agreement, including this Appendix. Participant further acknowledges that he or she has read and specifically and expressly approves the following paragraphs of the Award Agreement: Termination, Acknowledgement, Responsibility for Taxes, Data Privacy, Governing Law and Choice of Venue and Imposition of Other Requirements.

*Notifications*

**Exchange Control Information.** Participant is required to report in his or her annual tax return: (a) any transfers of cash or shares to or from Italy; (b) any foreign investments or investments (including proceeds from the sale of Restricted Stock Units acquired under the Plan) held outside of Italy, if the investment may give rise to income in Italy (this will include reporting the shares issued at vesting of the Award combined with other foreign assets); and (c) the amount of the transfers to and from abroad which have had an impact during the calendar year on Participant's foreign investments or investments held outside of Italy. Participant is exempt from the formalities in (a) if the investments are made through an authorized broker resident in Italy, as the broker will comply with the reporting obligation on Participant's behalf.

**JAPAN**

*Notifications*

**Exchange Control Information**. If the value of Shares that may be acquired in any one transaction exceeds ¥100,000,000, Participant must notify the Ministry of Finance ("MOF") within 20 days of acquisition.

**Foreign Asset/Account Reporting Information.** Participant will be required to report details of any assets (including any Shares acquired under the Plan) held outside of Japan as of December 31st of each year, to the extent such assets have a total net fair market value exceeding ¥50,000,000. Such report will be due by March 15th of the following year. Participant should consult with Participant's personal tax advisor as to whether the reporting obligation applies and whether Participant will be required to report details of any outstanding Shares held by Participant in the report.

# MEXICO

*Terms and Conditions*

**Modification.** By accepting the Restricted Stock Units, Participant understands and agrees that any modification of the Plan or the Agreement or its termination shall not constitute a change or impairment of the terms and conditions of Participant's employment.

**Acknowledgement of the Agreement.** In accepting the Restricted Stock Units, Participant acknowledges that he or she has received a copy of the Plan, has reviewed the Plan and the Agreement in their entirety and fully understands and accepts all provisions of the Plan and the Agreement. Participant further acknowledges that he or she has read and specifically and expressly approves the terms and conditions of the Agreement, in which the following is clearly described and established:

(1)     Participant's participation in the Plan does not constitute an acquired right.

(2)     The Plan and Participant's participation in the Plan are offered by the Company on a wholly discretionary basis.

(3)     Participant's participation in the Plan is voluntary.

(4)     The Employer, the Company and its Subsidiaries and affiliates are not responsible for any decrease in the value of the underlying Shares.

**Labor Law Acknowledgement and Policy Statement.**

In accepting the Restricted Stock Units, Participant expressly recognizes that Twitter, Inc. with registered offices at 1355 Market Street, Suite 900, San Francisco, 94103, U.S.A., is solely responsible for the administration of the Plan and that Participant's participation in the Plan and acquisition of Shares does not constitute an employment relationship between Participant and Twitter, Inc. since Participant is participating in the Plan on a wholly commercial basis and on a wholly voluntary basis and Participant's sole employer is Twitter México, S.A. de C.V. ("Twitter-Mexico"). Based on the foregoing, Participant expressly recognizes that the Plan and the benefits that he or she may derive from participation in the Plan do not establish any rights between Participant and Participant's employer, Twitter-Mexico, and do not form part of the employment conditions and/or benefits provided by Twitter-Mexico and any modification of the Plan or its termination shall not constitute a change or impairment of the terms and conditions of Participant's employment.

Participant further understands that his or her participation in the Plan is as a result of a unilateral and discretionary decision of Twitter, Inc.; therefore, Twitter, Inc. reserves the absolute right to amend and/or discontinue Participant's participation at any time without any liability to Participant.

Finally, Participant hereby declares that he or she does not reserve to himself or herself any

action or right to bring any claim against Twitter, Inc. for any compensation or damages regarding any provision of the Plan or the benefits derived under the Plan, and Participant therefore grants a full and broad release to Twitter, Inc., its Subsidiary, affiliates, branches, representation offices, its shareholders, officers, agents or legal representatives with respect to any claim that may arise.

## NETHERLANDS

*Notifications*

**Insider-Trading Notification.** Participant should be aware of the Dutch insider-trading rules, which may impact the sale of Shares issued to Participant at vesting and settlement of the Restricted Stock Units. In particular, Participant may be prohibited from effectuating certain transactions involving Shares if Participant has inside information about the Company. If Participant is uncertain whether the insider-trading rules apply to Participant, Participant should consult his or her personal legal advisor.

## PHILIPPINES

*Notifications*

**Securities Law Information.** Participant is permitted to dispose or sell Shares acquired under the Plan provided the offer and resale of the Shares takes place outside of the Philippines through the facilities of a stock exchange on which the Shares are listed. The Shares are currently listed on the New York Stock Exchange in the United States of America.

# POLAND

*Terms and Conditions*

**Consent to Receive Information in English.** By accepting the Restricted Stock Unit, Participant confirms having read and understood the Plan and the Agreement, which were provided in the English language. Participant accepts the terms of those documents accordingly.

*Notifications*

**Exchange Control Information.**   Polish residents holding foreign securities (including shares of Stock) and maintaining accounts abroad must report information to the National Bank of Poland. Specifically, if the value of Participant's securities and cash held in an account abroad (calculated individually or together with other assets/liabilities possessed abroad) exceeds PLN7 million at the end of the year, Participant must file reports with the National Bank of Poland regarding any transactions and the balances of the foreign accounts. If required, the reports are due on a quarterly basis by the 26th day following the end of each quarter and an annual report by no later than January 30th of the following calendar year.

Participants who at the end of the year did not reach the given threshold but in the next year, at the end of a calendar quarter, reach the threshold, are obliged to submit the appropriate form to NBP for this quarter and each of the following quarters of this calendar year (within 26 days from the end of each calendar quarter). The reports are filed on special forms available on the website of the National Bank of Poland.

Additionally, if Participant is a Polish citizen and transfers funds abroad in excess of the PLN equivalent of €15,000, the transfer must be made through an authorized bank, a payment institution or an electronic money institution authorized to render payment services.

At the banks' request, Polish residents may be required to inform eligible banks, within the meaning of the Foreign Exchange Act, about all foreign exchange transactions performed through them.

In addition, Participant should maintain evidence of such foreign exchange transactions for five years (as measured from the end of the year in which such transaction occurred), in case of a request for their production by the National Bank of Poland.

# RUSSIA

## *Terms and Conditions*

**U.S. Transaction.**  Participant understands that the Restricted Stock Units shall be valid and this Agreement shall be concluded and become effective only when the Agreement is electronically received by the Company in the United States.  Upon vesting of Restricted Stock Units, any Shares to be issued to Participant shall be delivered to him or her through a bank or brokerage account in the United States.  Participant is not permitted to sell the shares directly to other Russian legal entities or individuals nor is Participant permitted to bring the shares into Russia.

## *Notifications*

**Securities Law Notification.**   This Appendix, the Award Agreement, the Plan and all other materials that Participant may receive regarding participation in the Plan do not constitute advertising or an offering of securities in Russia.  Absent any requirement under local law, the issuance of securities pursuant to the Plan has not and will not be registered in Russia; hence, the securities described in any Plan-related documents may not be used for offering or public circulation in Russia.

Depending on the development of local regulatory requirements, the Company reserves the right to restrict Participant to settle the Restricted Stock Units in cash or require the immediate sale of Shares at vesting, or cancel the outstanding Restricted Stock Units if the grant or vesting/issuance of Shares is not compliant with Russian securities laws.

**Exchange Control Information.**    Under current exchange control regulations, within a reasonably short time after sale of the Shares acquired under the Plan or the receipt of dividends (if any), Participant must repatriate the proceeds to Russia.  Such proceeds must initially be credited to Participant through a foreign currency account at an authorized bank in Russia.  After the proceeds are initially received in Russia, they may be further remitted to foreign banks in accordance with Russian exchange control laws.

As an express statutory exception to this repatriation requirement, cash dividends paid on shares of Stock can be paid directly into a foreign bank or brokerage account opened with a bank located in Organisation for Economic Cooperation Development ("OECD") or Financial Action Task Force ("FATF") countries (e.g., the United States) without first remitting them to a bank account in Russia.  As of January 1, 2018, cash proceeds from the sale of shares listed on one of the foreign stock exchanges on the list provided for by the Russian Federal law "On the Securities Market" (which currently includes the NYSE) can also be paid directly to a foreign bank or brokerage account opened with a bank located in an OECD or FATF country.  Other statutory exceptions may also apply.

On July 21, 2014, Law No. 218-FZ "On Amending Certain Legislative Acts of Russian Federation" ("Law No. 218"), which introduces major amendments to Federal Law No. 173-FZ

of December 10, 2003 "On Currency Regulation and Currency Control" was passed and entered into effect on January 1, 2015. In particular, Law No. 218 imposes an additional obligation on Participant from a currency control standpoint, to file reports about cash flows and movement of funds in his or her foreign bank account(s) to the tax authorities. Participant will be required to submit reports about cash flows in his or her foreign bank account(s) on an annual basis.

Participant is encouraged to contact his or her personal advisor regarding any tax reporting requirements and before remitting his or her proceeds to Russia as exchange control requirements may change.

## SINGAPORE

### *Notifications*

**Securities Law Information**.  The grant of the Restricted Stock Units is being made pursuant to the "Qualifying Person" exemption under section 273(1)(f) of the Singapore Securities and Futures Act (Chapter 289, 2006 Ed.) ("SFA").  The Plan has not been lodged or registered as a prospectus with the Monetary Authority of Singapore.  Participant should note that the Restricted Stock Units are subject to section 257 of the SFA and Participant will not be able to make any subsequent sale in Singapore of the Shares acquired through the vesting of the Restricted Stock Units or any offer of such sale in Singapore unless such sale or offer is made pursuant to the exemptions under Part XIII Division (1) Subdivision (4) (other than section 280) of the SFA.

**Director Notification Obligation**.  If Participant is a director, associate director or shadow director of a Singapore Subsidiary, Participant is subject to certain notification requirements under the Singapore Companies Act, regardless of whether he or she is a Singapore resident or employed in Singapore.  Among these requirements is an obligation to notify the Singapore Subsidiary in writing when Participant receives an interest (*e.g.*, Units, shares of Stock) in the Company or any Subsidiary.  In addition, Participant must notify the Singapore Subsidiary when Participant sells Shares of the Company or any Subsidiary (including when Participant sells Shares acquired through the vesting of his or her Restricted Stock Units).  These notifications must be made within two business days of acquiring or disposing of any interest in the Company or any Subsidiary.  In addition, a notification must be made of Participant's interests in the Company or any Subsidiary within two business days of becoming a director, associate director, or shadow director if such interest exists at that time.

## SOUTH KOREA

### *Notification*

**Exchange Control Information.**  To remit funds of more than US$50,000 per year out of Korea, Participant must obtain a confirmation of the remittance by a foreign exchange bank in Korea. If Participant realizes US$500,000 or more from the sale of Shares or the receipt of

dividends in a single transaction, Participant must repatriate the proceeds to Korea within 18 months of the sale/receipt.   Under certain circumstances, separate sales may be deemed a single transaction and aggregated for purposes of the US$500,000 threshold.   Accordingly, Participant is strongly encouraged to consult his or her personal legal advisor if the sum of all such transactions exceeds this threshold.

**Foreign Account Reporting.** Korean residents must report information on their foreign bank and financial accounts to the tax authority if the aggregate balance exceeds KRW 0.5 billion at the end of any one month during the year. Reports must be submitted from 1 June to no later than 30 June in the following year.   Since the exchange control regulations change frequently and without notice, Participant should consult his or her personal legal advisor to ensure compliance with current regulations.

# SPAIN

## *Terms and Conditions*

**Nature of Grant.**  This provision supplements Section 10 (Nature of Grant) of Exhibit A of the Award Agreement:

In accepting the Restricted Stock Units, Participant consents to participate in the Plan and acknowledges that he or she has received a copy of the Plan.

Participant understands that the Company has unilaterally, gratuitously, and in its sole discretion decided to grant Restricted Stock Units under the Plan to individuals who may be employees of the Company or one of its Subsidiaries or affiliates throughout the world.  The decision is a limited decision that is entered into upon the express assumption and condition that any grant will not bind the Company or any Subsidiary or affiliate, other than to the extent set forth in the Agreement.  Consequently, Participant understands that the grant of Restricted Stock Units is made on the assumption and condition that the Restricted Stock Units and any Shares acquired under the Plan are not part of any employment contract (either with the Company or any Subsidiary or affiliate), and shall not be considered a mandatory benefit, salary for any purposes (including severance compensation) or any other right whatsoever.  Furthermore, Participant understands and freely accepts that there is no guarantee that any benefit whatsoever shall arise from the award, which is gratuitous and discretionary, since the future value of the Restricted Stock Units and the underlying shares is unknown and unpredictable. Further, Participant understands that the grant of the Restricted Stock Units would not be made but for the assumptions and conditions referred to above; thus, he or she acknowledges and freely accept that, should any or all of the assumptions be mistaken or should any of the conditions not be met for any reason, then any grant of or right to the Restricted Stock Units shall be null and void.

## *Notifications*

**Tax Reporting Obligation for Assets Held Abroad.**
If Participant holds assets or rights outside of Spain (including Shares acquired under the Plan), he or she may have to file an informational tax report, Form 720, with the tax authorities declaring such ownership by March 31st of the following year.  Generally, this reporting obligation is based on the value of those rights and assets as of December 31 and has a threshold of €50,000 per type group of asset (one type of group being Securities, rights, insurance policies and income located abroad). Please note that reporting requirements are based on what Participant has previously disclosed and the increase in value of such and the total value of certain groups of foreign assets.  Also, the thresholds for annual filing requirements may change each year. Therefore, Participant should consult his or her personal advisor regarding whether he or she will be required to file an informational tax report for assets and rights that he or she holds abroad.

**Exchange Control Information.**    Participant must declare the acquisition, ownership, and

disposition of stock in a foreign company (including Shares acquired under the Plan) to the *Dirección General de Comercio e Inversiones* ("DGCI") of the *Ministerio de Economía* for statistical purposes. Generally, the declaration must be made in January for Shares acquired or sold during (or owned as of December 31 of) the prior year; however, if the value of Shares acquired or sold exceeds €1,502,530 (or the Participant holds 10% or more of the shares capital of the Company or such other amount that would entitle him or her to join the Company's board of directors), the declaration must be filed within one month of the acquisition or sale, as applicable.

Additionally, Participant may be required to declare electronically to the Bank of Spain any securities accounts (including brokerage accounts held abroad), any foreign instruments (e.g., Shares) and any transactions with non-Spanish residents (including any payments of cash or shares made to Participant by the Company) if the balances in such accounts together with the value of such instruments as of December 31, or the volume of transactions with non-Spanish residents during the prior or current year, exceeds €50,000. Once the €50,000 threshold has been surpassed in either respect, Participant will generally be required to report all foreign accounts, foreign instruments and transactions with non-Spanish residents, even if the relevant threshold has not been crossed for an individual item. Generally, Participant will only be required to report on an annual basis (by March 31 of each year).

When receiving foreign currency payments derived from the ownership of the shares (*i.e.*, dividends or sale proceeds), Participant must inform the Spanish Registered Entity receiving the payment of the basis upon which such payment is made. Should the amounts exceed €12,500, Participant will need to provide the following information to the Spanish Registered Entity: (i) his or her name, address, and tax identification number; (ii) the name and corporate domicile of the Company; (iii) the amount of the payment and the currency used; (iv) the country of origin; (v) the reasons for the payment; and (vi) any further information that may be required. Exceptions to this rule are when Participant moves funds through a Spanish resident bank account opened abroad, or when collections and payments are carried out in cash. These exceptions, however, are subject to their own reporting requirements.

## UNITED ARAB EMIRATES

**There are no country specific provisions.**

## UNITED STATES

**There are no country specific provisions.**

## UNITED KINGDOM

### *Terms and Conditions*

**<u>Tax Reporting and Payment Liability</u>**.    The following provision supplements Exhibit A, Section 7 (Responsibility for Taxes) of the Award Agreement:

If payment or withholding of any income tax liability arising in connection with Participant's participation in the Plan is not made by Participant to the Employer within ninety (90) days of the end of the U.K. tax year in which the event giving rise to such income tax liability or such other period specified in Section 222(1)(c) of the U.K. Income Tax (Earnings and Pensions) Act 2003 occurs (the "Due Date"), Participant understands and agrees that the amount of any uncollected income tax will constitute a loan owed by the Participant to the Employer, effective on the Due Date.  Participant understands and agrees that the loan will bear interest at the then-current official rate of Her Majesty's Revenue and Customs ("HMRC"), it will be immediately due and repayable by the Participant, and the Company and/or the Employer may recover it at any time thereafter by any of the means referred to in the Plan and/or this Award Agreement.

Notwithstanding the foregoing, if Participant is an executive officer or director (as within the meaning of Section 13(k) of the U.S. Securities and Exchange Act of 1934, as amended), the terms of the provision above will not apply.   In the event that Participant is an executive office or director and income tax is not collected from or paid by Participant by the Due Date, the amount of any uncollected income tax will constitute a benefit to Participant on which additional income tax and National Insurance Contributions ("NICs") (including Employer's NICs, as defined below) may be payable.   Participant understands that he or she will be responsible for reporting and paying any income tax due on this additional benefit directly to HMRC under the self-assessment regime and for reimbursing the Company and/or the Employer (as appropriate) for the value of any NICs due on this additional benefit.

### <u>Joint Election.</u>

Tax-Related Items, as defined in Exhibit A, Section 7 shall include Primary and to the extent legally possible Secondary Class 1 National Insurance Contributions.

As a term of receiving the grant of Restricted Stock Units, Participant agrees to accept any liability for all secondary Class 1 NICs which may be payable by the Company and/or the Parent or Subsidiary employing or retaining Participant in connection with the Restricted Stock Units and any event giving rise to Tax-Related Items (the "Employer's NICs").   Without limitation to the foregoing, Participant agrees to enter into a joint election with the Company (the "Joint Election"), the form of such Joint Election being formally approved by HMRC, and to execute any other consents or elections required to accomplish the transfer of the entirety of Employer's NICs to the employee.  Participant further agrees to execute such other joint elections as may be required between Participant and any successor to the Company and/or the Parent or Subsidiary employing or retaining Participant.   Participant further agrees that the Company and/or the Parent or Subsidiary employing or retaining Participant may collect the Employer's NICs from him or her by any of the means set forth in Exhibit A, Section 7 of the Award Agreement.

If Participant does not enter into a Joint Election, if approval of the Joint Election has been withdrawn by HMRC or if such Joint Election is jointly revoked by Participant and the Company or the Parent or Subsidiary employing or retaining Participant, as applicable, the Company, in its sole discretion and without any liability to the Company or the Parent or Subsidiary employing or retaining Participant, may choose not to issue or deliver any Shares to the employee upon vesting of the Restricted Stock Units.

For the avoidance of doubt, this requirement will apply to all Participants that work in the U.K. during any period from grant through the vesting date of the Restricted Stock Units regardless of whether Participant was in the U.K. at the time of grant.

(Joint Election Form on the next page)

*Notification*

**Securities Disclaimer.**   Neither this Agreement nor Appendix is an approved prospectus for the purposes of section 85(1) of the Financial Services and Markets Act 2000 ("FSMA") and no offer of transferable securities to the public (for the purposes of section 102B of FSMA) is being made in connection with the Plan.   The Plan and the Restricted Stock Units are exclusively available in the UK to bona fide employees and former employees and any other UK Subsidiary.

\*\*\*\*

End of the Appendix

# JOINT ELECTION FOR THE TRANSFER OF EMPLOYER'S NATIONAL INSURANCE CONTRIBUTIONS TO THE EMPLOYEE

**1. Between**

The Company, Twitter UK Ltd ('the Secondary Contributor' who is the employer), whose Registered Office is at 100 NEW BRIDGE ST, LONDON, EC4V 6JA and registered number is 7653064, **and**

Nicholas Caldwell, 'the Employee', whose National Insurance number is _____.

**2. Purpose and scope of election**

(a) This election covers

- grant of employment related securities options

- the award of employment related restricted securities and/ or

- the award of any other employment related securities not mentioned above but provided for by any future or subsequent Twitter, Inc. equity incentive plans

under

- Plan: Any and ALL future or subsequent Twitter, Inc. equity incentive plans.

- on or after ..........................  December 14, 2021

(b) This joint election is made in accordance with Paragraph 3B(1) of Schedule 1 of the Social Security Contributions and Benefits Act 1992 ('SSCBA 1992').

(c) The Company requests the Employee to enter into this joint election to transfer the liability for the secondary contributor's National Insurance contributions (NICs) that arise on any **relevant employment income** covered by this election from the secondary contributor to the Employee.

(d) The employer's National Insurance liability that shall transfer from the employer to the Employee under this joint election is

- the whole of the secondary liability

  **Relevant employment income** from securities and options specified in 2(a) on which employer's NICs becomes due is defined as:

  i. an amount that counts as employment income of the earner under section 426 of ITEPA 2003 (restricted securities: charge on certain post-acquisition events),
  ii. an amount that counts as employment income of the earner under section 438 of that Act (convertible securities: charge on certain post-acquisition events), or
  iii. any gain that is treated as remuneration derived from the earner's employment by virtue of section

4(4)(a) SSCBA 1992.

(e) This joint election will not apply to the extent that it relates to relevant employment income which is employment income of the earner by virtue of Chapter 3A of Part 7 of ITEPA 2003 (employment income: securities with artificially depressed market value).

(f) This election does not apply in relation to any liability, or any part of any liability, arising as a result of regulations being given retrospective effect by virtue of section 4B(2) of either the Social Security Contributions and Benefits Act 1992 or the Social Security Contributions and Benefits (Northern Ireland) Act 1992.

## 3. Arrangements for payment of secondary NICs

(a) In signing this joint-election the Employee authorises the Company, or other body (if applicable), to recover an amount sufficient to cover the liability for the employer's NICs transferred under this election in accordance with the arrangements summarised below.

- A deduction from salary or other payments due.

- The delivery in cleared funds from the Employee in sufficient time to enable the Company to make payment to HM Revenue & Customs (HMRC).

- The sale of sufficient shares acquired from the Employee's securities option following notification to the Company Secretary/Scheme Administrator (delete as necessary or add other party if applicable), the proceeds of which must be delivered to the Company in sufficient time for payment to be made to HMRC by the due date.

- A deduction from any cash payment, treated as Relevant Employment Income, given to the Employee.

- Where the proceeds of the gain are to be made through a third party, the Employee will authorise that party to withhold an amount from the payment or to sell shares sufficient to cover the secondary NICs transferred. Such amount will be paid in sufficient time to enable the Company to make payment to HMRC by the due date.

(b) The Company and the Employee will ensure that payment of the liability for the secondary NICs will be made to HMRC within 14 days following the end of the Income Tax month in which the relevant employment income arises – the due date.

**The Employee understands that in making this election they will be personally liable for the secondary NICs covered by this election.**

## 4. Duration of this election

(a) This joint election shall continue in force from the time it is made until whichever of the following first takes place:

- The Company gives notice to the Employee terminating the joint election

- it is cancelled jointly by the Company and the Employee

- it ceases to have effect in accordance with the terms of the joint election

- HMRC serves notice on the Company that the approval of the joint election has been withdrawn

(b) The terms of this joint-election will continue in full force regardless of whether the Employee ceases to be an

employee of the Company.

**5. Declaration**

In signing this joint election both the Company and the Employee agree to be bound by its terms as stated above.


Signature of Employee ................................................................ Date: ......./......./.......


Signature for the Company:                                      Date: <u>December 14, 2021</u>


Position in Company:  Chief Financial Officer