| | |
|---|---|
| MORGAN, LEWIS & BOCKIUS LLP<br>Eric Meckley (Bar No. 168181)<br>eric.meckley@morganlewis.com<br>One Market, Spear Street Tower<br>San Francisco, CA 94105-1126<br>Tel: +1.415.442.1000 | MORGAN, LEWIS & BOCKIUS LLP<br>Christopher Boran (admitted *pro hac vice*)<br>christopher.boran@morganlewis.com<br>110 North Wacker Drive, Suite 2800<br>Chicago, IL 60606-1511<br>Tel: +1.312.324.1000 |
| Jeremy P. Blumenfeld (admitted *pro hac vice*)<br>jeremy.blumenfeld@morganlewis.com<br>Brian W. Sullivan (admitted *pro hac vice*)<br>brian.sullivan@morganlewis.com<br>2222 Market Street<br>Philadelphia, PA 19103-3007<br>Tel: +1.215.963.5000 | Abbey M. Glenn (Bar No. 267751)<br>abbey.glenn@morganlewis.com<br>1111 Pennsylvania Ave, NW<br>Washington, DC 20004-2541<br>Tel: +1.202.739.3000 |

*Attorneys for Defendants*

RUDY, EXELROD, ZIEFF & LOWE LLP
David A. Lowe (Bar No. 178811)
dal@rezlaw.com
Zoe DeGeer
zrd@rezlaw.com
351 California Street, Suite 700
San Francisco, CA 94104
Tel: +1.415.434.9800

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| NICHOLAS CALDWELL,<br><br>             Plaintiff,<br><br>     vs.<br><br>ELON MUSK; X CORP., f/k/a TWITTER, INC.; TWITTER, INC. CHANGE OF CONTROL AND INVOLUNTARY TERMINATION PROTECTION POLICY; LINDSAY CHAPMAN; BRIAN BJELDE; DHRUV BATURA; and DOES 1-20, inclusive,<br><br>             Defendants.<br>_____ / | Case No. 3:24-cv-02022-MMC<br><br>**JOINT CASE MANAGEMENT CONFERENCE STATEMENT**<br><br>Date:      July 12, 2024<br>Time:      10:30 am<br>Judge:     Hon. Maxine M. Chesney<br>Location:  Courtroom 7 (via Zoom) |

Pursuant to the Court's May 8, 2024 Case Management Conference Order, the Parties hereby submit this Joint Case Management Conference Statement.

### 1. Jurisdiction and service

Plaintiff's claims arise under the Employee Retirement Income Security Act of 1974, 29 U.S.C. Sections 1001-1461 ("ERISA"). This Court has subject matter jurisdiction over the claims pursuant to 29 U.S.C. Section 1132(e)(1) and 28 U.S.C. Section 1331. All Defendants have been served (or waived service) and have appeared in the action.

### 2. Facts

#### a. Plaintiff's Brief Chronology of Facts

This case is about Defendant Elon Musk's abuse of the ERISA process to deprive Plaintiff Caldwell of $19,290,000 in severance benefits.

Caldwell was a high performing and diligent executive who acted at all times in the interests of Twitter and its shareholders. Following Musk's acquisition of Twitter, Caldwell notified Twitter on October 28, 2022 of his intent to resign for "Good Reason" pursuant to Twitter's change of control severance plan and offered to remain employed until a mutually agreeable date to assist with the transition. Under the terms of the plan, "Good Reason" for resignation exists if Caldwell no longer reports to the CEO of a publicly traded company, which occurred when Musk acquired Twitter and halted trading of Twitter stock on October 27, 2022.

Five days after Caldwell notified Twitter of his intent to resign for "Good Reason," on November 2, 2022, Twitter's Human Resources department emailed Caldwell to inform him that his access to Twitter's systems would be cut off but that he would remain employed until November 27, 2022. On November 27, the date Caldwell's resignation for "Good Reason" became effective, Musk attempted to prevent Caldwell from receiving his severance benefits by purporting to fire him for "Cause."

The November 27 termination letter signed by Musk did not identify any factual basis for his allegation of "Cause," because there is none. Musk simply accused Caldwell, without any basis, of two types of Cause, as defined by the severance plan: "an uncurable 'failure to comply with the Company's written policies or rules, including its code of conduct,'" and "gross

negligence or willful misconduct in the performance of your duties."

Knowing that there was no "Cause" for his termination, Caldwell filed an ERISA claim for benefits. Musk, or those acting on his behalf, appointed one of his agents as Plan Administrator to deny Caldwell's claim. The Plan Administrator, Lindsay Chapman, identified herself in correspondence regarding Caldwell's claim as a part of the Twitter Human Resources team, as indicated on her letterhead:

> **Lindsay Chapman**
> Human Resources
>
> **Twitter, Inc.**
> 1355 Market Street, #900
> San Francisco, CA 94103

She signed the letter as "Administrator, Human Resources," and sent the letter from her Twitter (lchapman@twitter.com) email address. In other words, the Plan Administrator identified herself as Musk's employee.

Chapman proceeded to deny Caldwell's claim on grounds that are demonstrably false. For example, in finding that Caldwell engaged in corporate waste constituting gross negligence or willful misconduct, she cited spending on an event that occurred *before Caldwell worked at Twitter*. In addition, Chapman mischaracterized the authorization of bonus payments that had been approved in the ordinary course of business. There is simply no factual support whatsoever for Chapman's conclusion that Caldwell engaged in gross negligence or willful misconduct.

Moreover, Chapman was unable to identify that Caldwell violated *any* policy or rule, as alleged in Musk's termination letter. Her denial letter simply abandoned that category of "Cause" asserted by Musk as a basis for the termination because there was no justification for it in the first place.

Finally, Chapman challenged whether Caldwell's resignation for Good Reason was effective and also whether the change of control severance plan allows for acceleration of time-based equity vesting. Just like Chapman's conclusions regarding the basis for "Cause" to terminate Caldwell, her conclusions regarding Caldwell's resignation and her interpretation of acceleration rights under the severance plan are not only incorrect, but flatly contradicted by the

evidence Chapman had before her. Chapman's conclusions are so off-base that they can only be explained as the result of an intentionally biased process to reach a predetermined outcome.

Because the Plan Administrator's denial was so clearly erroneous, Caldwell promptly appealed, providing facts and evidence to dispute the Plan Administrator's conclusions. The request for review was supported by documents and declarations, including a declaration from former CEO Parag Agrawal and from an executive compensation expert.

Further cementing the conflict of interest and ensuring that the outcome would be favorable to Musk, Musk (or those acting on his behalf) appointed to the review committee Chapman herself, as well as her apparent boss, and a third Musk employee. In other words, the committee reviewing the correctness of the Plan Administrator's decision included the Plan Administrator who made the decision, the Musk employee who supervises her, and a third long-time Musk employee. There was not an iota of independence at any step of the process.

Inevitably, the committee upheld the denial of claims. However, the committee was forced to concede that there was no evidence that Caldwell engaged in corporate waste, and that was not a basis to terminate him for "Cause."

Because there was no evidence Caldwell engaged in corporate waste, and because the allegation that Caldwell improperly approved bonuses is also false, the committee concocted a brand-new reason for termination that had never been raised by Musk's termination letter or the Plan Administrator's denial.

Specifically, the committee asserted that Caldwell engaged in misconduct by accepting Twitter's decision to add him to the severance plan after he was promoted to General Manager. This argument is so absurd as to reveal the whole process as a charade.

Based on his outstanding performance, Caldwell was duly promoted in December 2021 to become General Manager of the largest organization within Twitter. In that role, he also became a member of "Staff," an executive team at Twitter reporting to the CEO. At the time of his promotion, executives at his level and members of Staff were participants in the change of control severance plan, including Caldwell's prior supervisor. Accordingly, Twitter's Comp Committee of the Board met in March 2022 and discussed and approved adding Caldwell (and a

small number of other executives who had been promoted to Staff roles following a reorganization and the departure of other Staff-level executives) to the change of control severance plan.

A few weeks later, in May 2022, Twitter provided the Participation Agreement to Caldwell, and he signed it. The Comp Committee met again in May and re-affirmed its decision regarding the participation of Caldwell and other executives in the change of control severance plan.

Caldwell's participation in the change of control severance plan was routine and in the ordinary course of business. The committee reviewing the Plan Administrator's decision did not point to *any evidence* to the contrary or that Caldwell believed that his participation on the plan was improper.

Nor did the committee explain why, if this was a ground for termination for Cause, Musk did not mention it in the termination letter or why the Plan Administrator did not mention it in her denial of Caldwell's claims. The only explanation for the committee's decision to assert this facially ridiculous allegation *after* Caldwell submitted his response to the Plan Administrator's denial is that the Plan Administrator and review committee do not care about even the appearance of fairness, let alone their fiduciary obligations.

Throughout this process, Caldwell requested documents relevant to the denial of his claims. While some documents were produced, they were not timely, and many more relevant document requests were simply ignored.

Finally, and adding insult to injury, Twitter refused to pay Caldwell hundreds of thousands of dollars in stock that vested on November 1, 2021, when he was indisputably still employed. Accordingly, Caldwell also brings a claim for breach of the equity agreements that provide for that vesting.

    **b.**  **Defendants' brief chronology of the facts.**

Plaintiff joined Twitter in June 2020. Only in December 2021 did Plaintiff become a member of Staff (the Twitter executive leadership team). Being a member of Staff is a prerequisite for consideration for participating in the Plan. Months after Plaintiff joined Staff, a

merger was announced whereby Twitter would be purchased by entities associated with Elon Musk.  The merger agreement was inked on April 25, 2022.  And only after the merger agreement and its stand-still provision took effect on April 25, 2022, did Plaintiff execute an agreement to participate in the Plan.  Plaintiff was terminated after the Twitter merger consummated in Fall 2022.

Plaintiff subsequently submitted a claim for benefits under the Plan, which he alleges amounts to $19.2 million, despite his short tenure on Staff and two and a half year service to the company.  Availing himself of the Plan's procedures for making claims under the Plan, Plaintiff submitted his original claim for benefits with the help of experienced legal counsel.

His claim was decided by a neutral and unconflicted Plan Administrator.[1]  The Plan Administrator has broad discretionary authority to interpret the Plan and decide claims for benefits under the Plan.  *See* Compl., Ex. 1 at ECF page 32 of 74 ("The Administrator will have full discretion to administer and interpret the [Plan].  Any decision made or action taken by the Administrator with respect to the [Plan], and any interpretation by the Administrator of any term or condition of the [Plan], or any related document, will be conclusive and binding on all persons and be given the maximum possible deference allowed by the law.").

The Plan Administrator carefully considered Plaintiff's claim before issuing a decision thoroughly explaining the reasons for denying the claim.  The Plan Administrator concluded that Plaintiff engaged in gross negligence and willful misconduct by personally requesting and approving millions of dollars in retention bonuses for members of his team, including approving more than $800,000 in compensation during the week preceding the merger's closing, in violation of the merger agreement.  These increased compensation payments were not in the ordinary course consistent with past practice, in violation of the merger agreement.  The Plan Administrator also found that Plaintiff contributed to corporate waste.

Plaintiff requested and received relevant documents, and subsequently submitted an

---

[1] Despite Plaintiff's assertion, it is unremarkable that the Plan Administrator used Twitter letterhead to correspond with a former Twitter employee soon after Twitter merged with brand new Musk-related entities.

appeal—again, through counsel—attaching various evidence, including expert opinion, sworn testimony, and other materials.  The appeal was considered and denied by a duly-appointed Committee that reviewed and considered Plaintiff's appeal and other submissions, rendering a detailed opinion that thoroughly addressed Plaintiff's various arguments and the evidence he offered in support.  In the end, the Committee agreed with the Plan Administrator that Plaintiff was terminated for cause.  The Committee found that Plaintiff engaged in gross negligence and willful misconduct by personally requesting and approving millions of dollars in retention bonuses for members of his team, including some bonuses during the very week leading up to the merger's closing.  Staff, including Claimant, knew the merger agreement required Musk's consent to any increased retention bonus program and that Musk refused consent.  Despite this, Staff members, including Plaintiff, took matters into their own hands and dramatically increased the retention bonuses they were providing to members of their respective teams.  On the other hand, the Committee disagreed with the Plan Administrator that Plaintiff contributed to the company's wasteful and grossly negligent spending.  This demonstrates that the Committee engaged in an independent assessment and did not merely rubber-stamp the Plan Administrator's conclusions.

At bottom, Plaintiff disagrees with the Plan Administrator's and Committee's conclusions.  But he cannot dispute that the Plan expressly conferred discretionary authority on the Plan Administrator and Committee to interpret the Plan and decide claims for benefits under the Plan.  As a result, that determination can be overturned only for an abuse of discretion.  *See Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955 (9th Cir. 2006).

As for Plaintiff's ERISA § 510 claim against Musk and X Corp., it fails for the reasons identified in Defendants' motion to dismiss.  Plaintiff was terminated for cause and was ultimately determined to be ineligible for severance benefits based upon an independent assessment by the Plan Administrator and Committee.  Yet this was merely a byproduct of the termination decision (as it is whenever any employee is terminated for cause and the employer has a severance plan)—not its motivating purpose.

Plaintiff also seeks to recover a $110 per day statutory penalty for an alleged delay in

producing unspecified, ERISA-required documents. Such statutory penalties are only available when certain governing plan documents are not timely produced to a plan participant. 29 U.S.C. §§ 1024(b), 1132(c)(1). Plaintiff received those documents long before he filed this action, and he is not entitled to any statutory penalties for any alleged delay in producing them. To the extent Plaintiff seeks penalties for documents he claims were not produced in violation of regulations concerning the claims and appeals process, those documents are not subject to § 1024(b) or § 1132(c)(1), as a matter of law, so penalties are unavailable. *See, e.g., Lee v. ING Groep, N.V.*, 829 F.3d 1158, 1162 (9th Cir. 2016).

### 3. Legal Issues

The Parties dispute the following main legal issues: (1) the appropriate standard of review the Court should apply in resolving Plaintiff's claim for benefits; (2) the scope of the administrative record and materials the Court should consider in resolving the benefits claim; (3) whether Plaintiff is entitled to benefits under ERISA Section 502(a)(1)(B): (4) whether Defendants Musk and X Corp. are liable, pursuant to ERISA Section 510, for firing Caldwell for the purpose of interfering with his attainment of severance benefits; (5) whether Defendants Chapman and Musk are liable for failing to timely provide Plaintiffs with required materials under ERISA Section 502(c); and (6) whether Defendants are liable for breaching Caldwell's equity agreements to vest additional stock in November 2022, while he was still employed.

### 4. Motions

#### a. Pending Motions

Defendant's Motion to Dismiss the Complaint's Second Cause of Action (Dkt. No. 35)—noticed for hearing on August 30, 2024; opposition due July 15, 2024; reply due August 5, 2024.

#### b. Anticipated Motions

Discovery motions are likely, but not inevitable. Plaintiff anticipates seeking discovery related to the alleged conflicts of interest relevant to the standard of review. Plaintiff may also seek discovery of materials that Plaintiff requested during the ERISA claims process and which Plaintiff contends should have been part of the administrative record but were not produced by Defendants. Depending on the resolution of Defendant's pending Motion to Dismiss, Plaintiff

will also seek discovery related to the decision to terminate Caldwell's employment.

Should the Parties disagree regarding the propriety or scope of discovery, counsel will meet and confer in good faith. If counsel are unable to reach agreement, a discovery motion will be necessary.

**5.   Amendment of Pleadings**

The Parties do not currently anticipate amending the pleadings but reserve their respective rights to do so.

**6.   Evidence Preservation**

The Parties have reviewed the Guidelines Relating to the Discovery of Electronically Stored Evidence and will meet and confer regarding the reasonable and proportionate steps to preserve evidence relevant to this action. Defendants have been notified and will instruct their agents to preserve documents relevant to Plaintiff's claims. Defendants have been notified to preserve potentially relevant documents and relevant third parties have been notified of the litigation.

**7.   Disclosures**

The Parties have agreed to exchange on July 15, 2024 initial disclosures under Federal Rule of Civil Procedure 26(a)(1).

**8.   Discovery**

No discovery has been taken yet in this action. Depending on the resolution of the various discovery issues described in section 4, above, Plaintiff believes that fact discovery could be completed in six to eight months.

Plaintiff's position is that fact discovery should proceed regarding the standard of review, *i.e.,* relating to the alleged conflict of interest and bias permeating the ERISA claims process. Plaintiff also contends that discovery should proceed regarding the additional documents requested, but not produced, relating to the denial of Caldwell's claim for benefits.

Plaintiff agrees that discovery specific to whether Caldwell was terminated for the purpose of interfering with his attainment of benefits pursuant to ERISA section 510 should be stayed pending the Court's ruling on Defendants' motion to dismiss that claim.

1     Defendants' position is that discovery should be limited to: (1) the administrative record; (2) discovery relating to the Plan Administrator's and Committee's alleged conflict of interest in adjudicating Plaintiff's claim for benefits, and (3) discovery relating to Plaintiff's claims for breach of contract and breach of the duty of good faith and fair dealing involving the alleged breach of the equity agreement. Discovery concerning Musk's and X Corp.'s alleged bias or pretext in connection with the decision to terminate Plaintiff is relevant only to his ERISA section 510 claim and may be obviated entirely by the Court's ruling on Defendants' pending motion to dismiss that claim.

    Defendants propose that all discovery be stayed pending the Court's ruling on Defendants' motion to dismiss, which will clarify what claims remain at issue in the case and the scope of discovery.

**9.  Class Actions**

Not applicable.

**10.  Related Cases**

*Robert Kaiden v. Musk, et al.*, 24-CV-03554-YMG (filed June 12, 2024), is a "related" case within the meaning of Civil Local Rule 3-12(a). The *Kaiden* matter is brought by a former Twitter executive against the same defendants as in this case and alleges a claim for benefits under the same 2014 change of control and severance plan at issue in this case.

In addition, *Agrawal, et al. v. Musk, et al.*, 3:24-cv-01304-MMC, is a case pending in this Court involving separate claims relating to the same severance plan.

**11.  Relief**

Plaintiff seeks approximately $19,290,000 in severance benefits due to him under the Plan, based on twelve months of base salary and COBRA premiums and the value of 50% of his then-unvested equity at the acquisition price of $54.20 per share.

Plaintiff also seeks appropriate equitable relief, including, but not limited to, front pay and equitable surcharge to remedy Defendants Musk and X Corp.'s violation of ERISA Section 510. Plaintiff further seeks a penalty of $110 per day from January 20, 2023 to the day that Defendants provide Plaintiff with all documents required to be provided under ERISA Sections 104(b) and

502(c) and 29 C.F.R. section 2560.503-1(m)(8).

Plaintiff also seeks specific performance or damages in the amount of $488,775 (at the acquisition price of $54.20 per share) for Defendants' violation of his equity agreements that provided for the November 2022 stock vest while he was still employed.

Finally, Plaintiff seeks pre-judgment and post-judgment interest and attorneys' fees and costs.

Defendants reserve their right to recover attorneys' fees in costs in the event they prevail on Plaintiffs' claims in this action, and further reserve their rights to seek relief with respect to any claims or counter-claims they may later assert in this action.

### 12. Settlement and ADR

On June 16, 2024, counsel for the Parties met and conferred about ADR. Plaintiff is amenable to a private mediation or a settlement conference before a magistrate judge or other judicial officer pursuant to ADR Local Rule 7. Defendants are amenable to engaging in private mediation or a settlement conference before a magistrate judge or other judicial officer at the appropriate time.

### 13. Other References

The Parties do not believe that the case is suitable for reference to binding arbitration, a special master, or the Judicial Panel on Multidistrict Litigation.

### 14. Narrowing of Issues

The Parties have not identified any stipulations or other means to narrow the issues before the Court. As the case progresses, counsel will continue to meet and confer regarding ways to streamline the case.

### 15. Expedited Trial Procedures.

The Parties do not believe that this case is appropriate for the Expedited Trial Procedures of General Order 65 Attachment A.

### 16. Scheduling

Plaintiff proposes the following schedule:
- Fact discovery cut-off: February 28, 2025;

- Rule 56 Motion for Summary Judgment
    - Motion due March 25, 2025;
    - Opposition due May 2, 2025;
    - Reply due May 23, 2025;
    - Hearing: June 27, 2025.
- Expert designations:  September 12, 2025
- Expert discovery cut-off:  October 10, 2025
- Pretrial status conference:  November 18, 2025
- Trial date: December 2, 2025

Defendants propose the following schedule:

- Fact discovery cut-off: April 25, 2025
- Expert designations (if any) – May 23, 2025
- Expert discovery cutoff (if any) – August 30, 2025
- Briefing Relating to Rule 52 Motion for Judgment
    - Plaintiff's Motion due October 10, 2025
    - Defendants' Opposition/Cross-Motion for Judgment due November 14, 2025
    - Plaintiff's Reply/Opposition due December 19, 2025
    - Defendants' Reply due January 23, 2026
    - Hearing: February 13, 2026

**17.    Trial**

The Parties agree that any claims asserted in the Complaint that proceed to trial will be tried to the Court.  Plaintiff estimates that the trial would be approximately five court days.

Defendants believe that most if not all of this case should be adjudicated through Rule 52 motions and that a separate bench trial will be unnecessary.  If the case does proceed to trial in any respect, Defendants estimate the trial would take up to five court days.

**18.    Disclosure of Non-Party Interested Entities or Persons**

Plaintiff filed his Certification of Conflicts and Interested Entities or Persons on June 28,

2024, stating that there is no conflict or interest (other than the named parties) to report.

Defendants filed their Rule 7.1 Corporate Disclosure Statement and Civil L.R. 3-15 Certification of Conflicts and Interested Entities or Persons on June 17, 2024, stating that there is no conflict or interest (other than the named parties) to report.

### 19.  **Professional Conduct**

All attorneys of record for the Parties have reviewed the Guidelines for Professional Conduct for the Northern District of California.

DATED:  July 3, 2024                                  Respectfully submitted,

                                          RUDY, EXELROD, ZIEFF & LOWE, LLP

By:  */s/ David A. Lowe*
     DAVID A. LOWE
     ZOË R. DEGEER
     *Attorneys for Plaintiff*
     *Nicholas Caldwell*

DATED:  July 3, 2024                                  MORGAN, LEWIS & BOCKIUS LLP

By:  */s/ Christopher Boran*
     CHRISTOPHER BORAN

     *Attorneys for Defendants Elon Musk; X Corp.; Twitter, Inc. Change of Control and Involuntary Termination protection Policy; Lindsay Chapman; Brian Bjelde; Dhruv Batura*