IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NICHOLAS CALDWELL,<br><br>Plaintiff,<br><br>v.<br><br>ELON MUSK, et al.,<br><br>Defendants. | Case No. 24-cv-02022-MMC<br><br>**ORDER DENYING DEFENDANTS' MOTION TO DISMISS SECOND CAUSE OF ACTION** |

Before the Court is the Motion to Dismiss, filed June 17, 2024, by defendants Elon Musk ("Musk"), X Corp. ("X"), formerly known as Twitter, Inc. ("Twitter"), Twitter, Inc. Change of Control and Involuntary Termination Protection Policy ("the Plan"), Lindsay Chapman ("Chapman"), Brian Bjelde ("Bjelde"), and Dhruv Batura ("Batura"), whereby defendants seek dismissal of the Second Cause of Action asserted in plaintiffs' Complaint. Plaintiff Nicholas Caldwell ("Caldwell") has filed opposition, to which defendants have replied. Having read and considered the papers filed in support of and in opposition to the motion, the Court rules as follows.[1]

**BACKGROUND**

The following factual allegations are contained in the Complaint and are assumed true for purposes of the instant Order. See NL Indus., Inc. v. Kaplan, 792 F.2d 896, 898 (9th Cir. 1986) (holding, for purposes of determining whether a plaintiff states a cognizable claim for relief, a district court "must accept as true all material allegations in the complaint and construe them in the light most favorable to [the plaintiff]").

---

[1] By order filed August 23, 2024, the Court took the matter under submission.

At the time of the events alleged in the Complaint, Caldwell was employed by Twitter, and later by X, as "General Manager of the Core Tech," a position in which he reported directly to Twitter's Chief Executive Officer.  (See Compl. ¶¶ 5, 22, 24.)  As such, Caldwell was a participant in the Plan (see Compl. ¶¶ 5, 24), a severance plan under which a participant is entitled to benefits, namely "accelerated vesting of 50% of his then-unvested equity, one year of base salary, and one year of COBRA benefits" (see Compl. ¶ 26), if the participant, within a specified time period following a change in control, either resigns for "Good Reason" or is terminated by Twitter for a reason "other than Cause, death, or Disability" (see Compl. Ex. 1 at 31).[2]  Additionally, during the course of his employment, Caldwell and Twitter were parties to a "2013 Equity Incentive Plan Restricted Stock Unit Agreement" ("Award Agreement") (see Compl. Ex. 2), under which Caldwell was entitled to receive "equity according to [a] regular vesting schedule" (see Compl. ¶ 4).

On April 25, 2022, the Board of Directors of Twitter accepted an offer to purchase Twitter Musk previously had made.  (See Compl. ¶ 28.)  Thereafter, Musk "attempted to back out of the deal" (see Compl. ¶ 29), Twitter sued Musk to "enforce the [m]erger [a]greement," and, "[a]fter intense litigation and on the eve of trial," Musk "agreed to complete the acquisition" (see Compl. ¶ 30).

On October 27, 2022, "the acquisition closed" (see id.), and X became the successor-in-interest to Twitter (see Compl. ¶¶ 6-7).  The next day, October 28, 2022, "Twitter's stock stopped trading" and Caldwell "no longer reported to the chief executive officer ['CEO'] or board of directors of a publicly traded entity" (see Compl. ¶ 30).  That same day, October 28, 2022, Caldwell "informed the company he was resigning for Good Reason pursuant to the Plan," namely, the fact that he "no longer report[ed] to the CEO of a publicly traded company."  (See Compl. ¶¶ 32-33.)

---

[2] In citing to the exhibits attached to the Complaint, the Court has used herein the page number affixed to the top of each page by this district's electronic filing program.

1  In said letter, Caldwell also stated "he was willing to stay employed by the
2 company as long as the company needed him to transition his role."  (See Compl. ¶ 33.)
3 In response to his letter, X, on November 2, 2022, informed Caldwell that "his access to
4 company systems was being cut off immediately" but that "he would be employed until
5 November 27, 2022" (see Compl. ¶ 34); additionally, according to Caldwell, X failed to
6 "vest" shares to which, under the Award Agreement, he was entitled as of November 1,
7 2022 (see Compl. ¶¶ 65-68).  On November 27, 2022, i.e., the date X stated would be
8 Caldwell's last date of employment, Musk sent Caldwell a letter, which Musk "personally
9 signed," stating Musk was "terminating [Caldwell] for Cause" (see Compl. ¶¶ 36, 37), but
10 not including any facts in support thereof (see Compl. ¶ 38).

11  On December 20, 2022, Caldwell submitted a claim for benefits (see Compl. ¶ 20),
12 which claim was denied by Chapman, the appointed "Administrator of the Plan," for the
13 stated reason that Caldwell's resignation was "not effective" and that he had been
14 "terminated for Cause" (see Compl. ¶ 39-40).  Thereafter, Caldwell submitted to "Twitter's
15 Severance Administration Committee," a committee consisting of Chapman, Bjelde, and
16 Batura, a request for review of the denial, which request was supported by "declarations"
17 and "documentary evidence."  (See Compl. ¶¶ 13, 45.)  According to Caldwell, the
18 Committee denied review on the basis of a "patently false" finding of "gross negligence or
19 willful misconduct" as well as an "absurd" finding of additional willful misconduct, made
20 for the first time in the Committee's denial and to which Caldwell was not afforded an
21 opportunity to reply.  (See Compl. ¶¶ 51-52.)

22  Based on the above, Caldwell asserts five Cause of Action, specifically, the First
23 Cause of Action, alleging, against all defendants pursuant to 29 U.S.C. § 1132(a)(1)(B), a
24 claim for severance benefits (see Compl. ¶ 72), the Second Cause of Action, alleging,
25 against Musk and X pursuant to 29 U.S.C. § 1140, a claim for unlawful discharge for the
26 purpose of interfering with Caldwell's rights to severance benefits (see Compl. ¶ 78), the
27 Third Cause of Action, alleging, against all defendant pursuant to 29 U.S.C. § 1132(c), a
28 claim for failure to timely provide required materials (see Compl. ¶ 84), the Fourth Cause

1   of Action, alleging against X pursuant to the "common law of contracts," a claim for
2   breach of contract predicated on a failure to perform under the Award Agreement (see
3   Compl. ¶ 89), and the Fifth Cause of Action, alleging against X pursuant to said common
4   law, a claim for breach of the implied covenant of good faith and fair dealing, likewise
5   predicated on the failure to perform under the Award Agreement (see Compl. ¶¶ 92-93).

## DISCUSSION

By the instant motion, defendants seek dismissal of only one Cause of Action, the Second Cause of Action, i.e., Caldwell's claim that Musk and X terminated Caldwell's employment for the purpose of interfering with his attainment of benefits under the Plan.

Under § 510 of ERISA, it is "unlawful for any person to discharge . . . a participant or beneficiary . . . for the purpose of interfering with the attainment of any right to which such participant may become entitled under [ERISA]." See 29 U.S.C. § 1140. Defendants do not contend Caldwell has failed to sufficiently allege he was terminated by Musk and X for such purpose. Rather, defendants argue, the claim is "foreclosed" by Caldwell's claim for severance benefits, namely, the First Cause of Action (see Defs.' Mot. at 2:9-10), and, in addition, that the claim is subject to dismissal on the ground the relief Caldwell seeks is unavailable as a matter of law. The Court considers the two arguments, in turn.

### A. Foreclosure of Second Cause of Action

Defendants contend Caldwell is unable to obtain relief under § 510, for the reason that, in the event he establishes he is entitled to benefits under the Plan, he would be, according to the terms thereof, required to execute Twitter's "then-standard separation agreement and release of claims" (see Compl. Ex. A at 29), at which point the Second Cause of Action would be barred, and, in the event he is unable to establish he is entitled to benefits, he would be unable to show he had a right under the Plan with which defendants could have interfered.

The Court need not determine whether circumstances exist under which Caldwell's § 510 claim would not be foreclosed by the determination of his claim for benefits; at the

4

1  pleading stage, a plaintiff is allowed to plead inconsistent claims.  See Fed. R. Civ. P.
2  8(d)(3) (providing "[a] party may state as many claims . . . as it has, regardless of
3  consistency"); Molsbergen v. United States, 757 F.2d 1016, 1018-19 (9th Cir. 1985)
4  (observing Rule 8 "explicitly authorizes litigants to present alternative and inconsistent
5  pleading in the same case"; holding, at pleading stage, district court "examine[s]"
6  assertedly inconsistent claims "independently" to determine cognizability of challenged
7  claim)

8        Accordingly, to the extent defendants seek dismissal of the Second Cause of
9  Action for the asserted reason said claim would be foreclosed by resolution of the First
10  Cause of Action, the motion will be denied.

11  **B.  Failure to State a Claim**

12        A plaintiff asserting a violation of § 510 may "bring a civil action (A) to enjoin any
13  violative act or practice, or (B) to obtain other appropriate equitable relief."  See Spinelli v.
14  Gaughan, 12 F.3d 853, 856 (9th Cir. 1993) (internal quotation, alterations, and citation
15  omitted).  In his Complaint, Caldwell seeks, as a remedy for the alleged violation of
16  § 510, "appropriate equitable relief" (see Compl. ¶ 80), and, in his Prayer for Relief,
17  requests the Court grant "equitable relief to [him], including restitution, disgorgement,
18  front pay and/or equitable surcharge" (see Compl., Prayer ¶ 4).

19        Defendants argue Caldwell fails to plead facts to show that any of the forms of
20  equitable relief identified in the Prayer for Relief could be awarded upon a finding of
21  liability, and, consequently, that the Complaint is, pursuant to Rule 12(b)6) of the Federal
22  Rules of Civil Procedure, subject to dismissal.  See Depot, Inc. v. Caring For Montanans,
23  Inc., 915 F.3d 643, 652, 661-65 (9th Cir. 2019) (affirming dismissal of ERISA claim where
24  plaintiffs failed to allege facts to support finding they were entitled to forms of equitable
25  relief they sought).

26        Dismissal under Rule 12(b)(6) "can be based on the lack of a cognizable legal
27  theory or the absence of sufficient facts alleged under a cognizable legal theory."  See
28  Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir. 1990).  In analyzing a

1  motion to dismiss, a district court must accept as true all material allegations in the
2  complaint and construe them in the light most favorable to the nonmoving party.  See NL
3  Indus., 792 F.2d at 898.  "To survive a motion to dismiss," however, "a complaint must
4  contain sufficient factual material, accepted as true, to 'state a claim to relief that is
5  plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic
6  Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  "Factual allegations must be enough to
7  raise a right to relief above the speculative level," Twombly, 550 U.S. at 555, and courts
8  "are not bound to accept as true a legal conclusion couched as a factual allegation," see
9  Iqbal, 556 U.S. at 678 (internal quotation and citation omitted).

10  The Court first considers whether Caldwell has alleged sufficient facts to show he
11  is entitled to restitution.  In that regard, Caldwell relies on his allegation that, under the
12  Plan, 50% of his "then-unvested shares" vested as of the date he qualified for severance
13  benefits (see Compl. ¶¶ 54-56), and argues the Court can award as "restitution" such
14  shares, which Caldwell contends X "now holds" (see Pl.'s Opp. at 10:7-8).

15  A plaintiff seeks "restitution *in equity*," however, only "where money or property
16  identified as belonging in good conscience to the plaintiff can clearly be traced to
17  particular funds or property in the defendant's possession," whereas a plaintiff seeks
18  "restitution *at law*" where "the plaintiff cannot assert title or right to possession of
19  particular property but instead seeks to impose personal liability on the defendant as a
20  means of recovering money to pay for some benefit the defendant received from the
21  plaintiff."  See Depot, 915 F.3d at 661 (emphases in original; internal quotations,
22  alterations, and citation omitted).

23  Here, Caldwell fails to allege that the vested shares he seeks are held in a
24  particular fund by either X or Musk, or are otherwise traceable to particular property
25  owned by either X or Musk.  Indeed, the terms of the Award Agreement appear to
26  foreclose any such showing, as said Agreement provides that, "[p]rior to actual payment
27  of any vested [shares], such [shares] will represent an unsecured obligation of the
28  Company, payable (if at all) only from the general assets of the Company."  (See Compl.

Ex. 2 at 42; see also Ex. 1 at 34 (stating, in section of Plan titled "Plan Costs," the "cost of the Policy is paid by the Company").)[3]

Caldwell's claim for disgorgement likewise is unavailing. In support of such claim, Caldwell again relies on the above-cited allegation regarding vested shares, and argues he is entitled to an order of "disgorgement of the shares," which shares he contends X "now holds." (See Pl.'s Opp. at 10:7-8.) Disgorgement is "simply a form of restitution measured by the defendant's wrongful gain rather than by the plaintiff's loss," see Depot, 915 F.3d at 663, and requires a showing that the defendant possesses "specific property from which proceeds or profits derived," see id. at 664-65. Caldwell, however, does not allege the vested shares he seeks to recover are held by X, or by Musk, and, as noted, the terms of the Agreement appear to foreclose any such allegation.

The Court next turns to Caldwell's request for front pay. "Reinstatement" to an employment position and "front pay" are "alternative remedies" for wrongful termination, including wrongful termination established under § 510. See Teutscher v. Woodson, 835 F.3d 936, 954 (9th Cir. 2016). "'[F]ront pay' may be awarded in equity as a substitute when the preferred remedy of reinstatement is unavailable or imprudent." Id. at 946. When appropriate, front pay is "an award of the salary and benefits a wrongfully demoted or discharged plaintiff would have earned from employment after the trial." See id. (internal quotation and citation omitted).[4] To establish entitlement to front pay, a plaintiff must show "the salary [he] was reasonably certain to have earned but for his wrongful discharge [and] the period over which he would have earned that salary." See id. at 948.

---

[3] Although Caldwell relies on the principle that, if a defendant places "ill-gotten funds" in a "general account," the plaintiff may seek to recover in equity from the general account the "ill-gotten" sum, see Zavala v. Kruse-Western, Inc., 2021 WL 5883125, at *6 (E.D. Cal. December 13, 2021) (citing Depot, 915 F.3d at 662), said principle is inapplicable here. Specifically, as Caldwell does not allege the value of vested shares he seeks ever "existed as a distinct object or fund," a judgment awarding him the value of the vested shares "would have no connection to any particular fund," i.e., it would be "restitution at law, not equity," see Depot, 915 F.3d at 662.

[4] By contrast, "backpay" is "an award of lost-wages damages through the time of trial." See id. (internal quotation and citation omitted).

7

Here, Caldwell, as noted, alleges that when he resigned the day after the merger closed, he stated "he was willing to stay employed by the company as long as the company needed him to transition his role." (See Compl. ¶ 33.)  Caldwell does not allege, however, that had he not been terminated by Musk, he would have continued to work for X for any significant period of time thereafter, i.e., a time of such a length that reinstatement would constitute a cognizable remedy, a threshold showing he must make. See id. at 949 (finding wrongfully terminated plaintiff submitted sufficient evidence to "prove up his front pay damages," specifically, his testimony "he would have continued working at [defendant's business] at [a specific] salary until retiring at around age sixty-seven"); Wooten v. BNSF Ry. Co., 387 F. Supp. 3d 1078, 1101-02 (D. Mont. 2019) (finding front pay award supported by evidence where plaintiff testified he "loved the job and had ambitions within the company" and "expressed [an] intent of working for [defendant] until retiring between the ages of 60 and 67").  Consequently, at the pleading stage, facts to support such a finding must be alleged.  See Depot, 915 F.3d at 665 (stating "facts and allegations" to support finding plaintiff is entitled to equitable relief under ERISA must "appear in plaintiff's complaint") (internal quotation, alteration and citation omitted).

Under the circumstances, Caldwell has failed to plead his entitlement to restitution, disgorgement, or front pay, and the Court next considers whether he has sufficiently pleaded entitlement to a surcharge.

A "surcharge" is "exclusively equitable" and is imposed to remedy "a breach of trust committed by [a] fiduciary encompassing any violation of a duty imposed upon that fiduciary."  See Cigna Corp. v. Amara, 563 U.S. 421, 442 (2011).  Where an ERISA fiduciary has breached a fiduciary duty, he can be required to "return" to the beneficiary any "benefit" the fiduciary gains by the breach or, alternatively, to pay "damages" to the beneficiary for "actual harm," i.e., the amount necessary to "put the beneficiary in the position he or she would have attained but for the trustee's breach."  See Skinner v. Northrop Grumman Retirement Plan, 673 F.3d 1162, 1167 (9th Cir. 2012).

8

Here, Caldwell alleges Musk is the Chairman, Sole Director, and controlling shareholder of X, and, as such, is "the de facto Administrator of the Plan[ ]." (See Compl. ¶ 6.) "[A] plan administrator engages in a fiduciary act when making a discretionary determination about whether a claimant is entitled to benefits under the terms of the plan documents." Varity v Howe, 516 U.S. 489, 511 (1996); see also id. at 513 (holding ERISA fiduciaries must "discharge their duties 'solely in the interest of the participants and beneficiaries'") (quoting ERISA § 404(a), 29 U.S.C. § 1104(a)).

The "fiduciary duties [specified in ERISA] draw much of their content from the common law of trusts." See id. at 496. As explained by the Supreme Court, a "traditional trustee" is "not permitted to place himself in a position where it would be for his own benefit to violate his duty to the beneficiaries." See Pegram v. Herdrich, 530 U.S. 211, 225 (2000) (internal quotation and citation omitted). "Under ERISA, however," as the Supreme Court further explained, fiduciaries "may have financial interests adverse to beneficiaries," such as when employers that are fiduciaries "act as employers (e.g., firing a beneficiary for reasons unrelated to the ERISA plan)", and, where such an ERISA fiduciary has "two hats," the "threshold question" is whether the fiduciary, "when taking the action subject to complaint," was "wear[ing] the fiduciary hat." See id. at 225-26.

Here, defendants argue, Musk was acting as an employer, not a fiduciary, when he terminated Caldwell.[5] To the extent defendants argue that, in all instances, a termination by an employer/fiduciary is an action taken as an employer, the Court disagrees. See id. at 225 (stating employer/fiduciary acts as employer when "firing a beneficiary for reasons unrelated to [an] ERISA plan]"). Although, as noted, a showing that Musk terminated Caldwell for "reasons unrelated to the ERISA plan" would be a non-fiduciary act, see id., the factual allegations in the Complaint, assumed true, support a finding that Musk fired Caldwell for reasons related to the Plan. Caldwell alleges, for

---

[5] The Court does not address herein defendants' argument, made for the first time in a footnote in their reply, that the Plans are exempt from compliance with ERISA's fiduciary duty provisions, Caldwell not having had an opportunity to respond thereto.

example, that his termination letter stated he was being terminated for "cause" under subsections "c" and "e" of the Plan (see Compl. ¶ 36) and that Musk had the termination letter sent "to evade paying [Caldwell] millions of dollars in severance benefits that [defendants] owed to [ ] Caldwell" (see Compl. ¶ 2).

Accordingly, the Court finds the Second Cause of Action is not subject to dismissal for failure to state a claim.

## CONCLUSION

For the reasons stated above, the motion to dismiss the Second Cause of Action is hereby DENIED.

**IT IS SO ORDERED.**

Dated: November 1, 2024

MAXINE M. CHESNEY
United States District Judge